887 F.2d 635
 Jack BERRY, the State of Mississippi for the Use and Benefit
of Jack Berry, Plaintiff-Appellee,
v.
Ronnie PETERSON, Individually and as Sheriff of Hancock
County, MS, Hancock County, MS, Burt Correge, Alton A.
"Dolph" Kellar, Robert Dale Ladner, Sam J. Perniciaro, Sr.,
James N. Travirca, each individually, and in their official
capacity as members of the Hancock County, Board of
Supervisors, along with each member's predecessors and
successors in office, Defendants-Appellants.
 No. 88-4350.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 8, 1989.
Rehearing Denied Dec. 27, 1989.
 
 Norman L. Breland, William Weatherly, Gulfport, Miss., for defendants-appellants.
 Oscar B. Ladner, Gulfport, Miss., plaintiff-appellee.
 John R. Martzell, James P. Nader, New Orleans, La., for Jack Barry.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before GEE, GARZA, and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 This appeal arises from an action brought under 42 U.S.C. Sec. 1983 by a former inmate at the Hancock County Jail in Mississippi. He was severely injured during a fire in the jail, and he sued for damages stemming from the fire. In a jury trial, the plaintiff was awarded $200,000. Because we find that Jack Berry voluntarily waived his right to sue under Sec. 1983, we reverse.
 
 BACKGROUND
 
 2
 On August 27, 1981, 17-year-old Jack Berry was a prisoner in the Hancock County Jail in Bay St. Louis, Mississippi. He was being held without bond on several charges. Late that day, while he was allegedly asleep, Berry's non-fire-retardant foam mattress caught fire and Berry was severely burned on his legs and arms. In April, 1982, Berry entered into a Covenant Not to Sue, signed by Berry, his parents and a representative of the Board of Supervisors on behalf of Hancock County. In the agreement, Berry consented to refrain from suing the county and its employees and officials for damages and medical expenses arising from the fire. In return, the county agreed to pay Berry's past and future medical bills. The county separately agreed to drop the arson charges based on the fire, and to recommend probation for four felony offenses pending against him.
 
 
 3
 Nevertheless, in 1986, Berry brought suit for his fire-related injuries against Hancock County, Sheriff Ronnie Peterson (Sheriff of Hancock County), and the Hancock County Board of Supervisors under 42 U.S.C. Sec. 1983 and pendent state law. Berry alleged that the defendants owed him a duty and a responsibility to provide him with a safe jail in which to be detained. He also alleged that the fire was proximately caused by the deliberate indifference of the defendants. In March 1988, a jury returned a sizeable verdict for Berry against all defendants. The district court denied the defendants' motions for judgment n.o.v. or a new trial. The defendants then filed this appeal.
 
 ANALYSIS
 
 4
 The only issue we reach is the enforceability of the Covenant Not to Sue.
 
 
 5
 In Town of Newton v. Rumery, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), the Supreme Court held that settling Sec. 1983 claims against public officials in exchange for a dismissal of criminal charges is not per se impermissible. The majority of the Court enunciated as a general rule that such agreements may be declared unenforceable if the interest in enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement. 480 U.S. at 392-93, 107 S.Ct. at 1192. Confronted with a Sec. 1983 lawsuit, the majority acknowledged, a prosecutor might weigh other officials' interest in avoiding a civil rights lawsuit more heavily than the public interest in penalizing crime, or a prosecutor might be inclined to trump up charges against a defendant to obtain leverage to compel settlement of the Sec. 1983 action. The majority declined to presume, however, that extraneous considerations would generally adversely influence prosecutors in the performance of their duty. Consequently, the Court permitted enforcement of such a release-dismissal agreement if it was voluntarily signed by the plaintiff, and if there was no evidence of prosecutorial overreaching or a disservice to the public interest. Justice O'Connor's special concurrence emphasized that she might be somewhat more wary of settlement agreements than the plurality opinion implied, but she rested on the same criteria for approving them: voluntariness; no prosecutorial overreaching; and conformity with the public interest. 480 U.S. at 397-99, 107 S.Ct. at 1195.
 
 
 6
 While Rumery poses this frame of reference for settlement-dismissal agreements, its facts do not illumine the present case. Rumery settled a Sec. 1983 claim for malicious prosecution in exchange for a dismissal of a charge for witness tampering. The voluntariness of his agreement was hardly at issue, because Rumery testified that he released his Sec. 1983 claim voluntarily. He was well-educated and represented by an attorney. His contention that execution of a Sec. 1983 claim settlement agreement under the threat of prosecution is inherently coercive was rejected by the Court. As for the other two criteria for enforceability, there was no suggestion of prosecutorial overreaching or that the settlement would not comport with the public interest. To the contrary, one of the official reasons for letting Rumery off the hook for witness tampering was to avoid putting the complainant, previously the victim of a brutal sexual attack by another man, through the anguish of additional judicial proceedings.
 
 
 7
 This case presents several twists absent from Rumery, which require us to analyze each of the three components of enforceability carefully.
 
 
 8
 At the outset, we must comment on the trial court's submission to the jury of an interrogatory asking whether the covenant not to sue between the Berry family and Hancock County "should be enforced." With this interrogatory, the court instructed the jury to determine each of the Rumery criteria for enforceability--voluntariness, prosecutorial overreaching, and whether public policy favored the agreement. This was error.[1] Voluntariness is the only possible fact issue in the Rumery formulation, hence, the only issue even arguably suitable for a jury. The other two criteria are issues of law involving policy choices made against the background of the court's familiarity with the criminal justice system, and they must be determined by the court.[2] The issue that the court submitted in this case improperly asked the jury to venture beyond their proper scope of action.
 
 A. Voluntariness
 
 9
 Because the jury found that the covenant not to sue was "unenforceable," we do not know whether they necessarily found that Jack Berry did not sign it voluntarily. In view of the defendants' having filed a timely motion for directed verdict, however, we must independently consider whether any reasonable jury could have found that Jack and his parents did not execute the agreement voluntarily. Boeing Company v. Shipman, 411 F.2d 365 (5th Cir.1969). We bear in mind Justice O'Connor's observation that "[m]any factors may bear on whether a release is voluntary ..." Rumery, 480 U.S. at 401-02, 107 S.Ct. at 1197.
 
 
 10
 Within days after the fire at the jail, Jack Berry's father retained Thomas Berry (no relation) to represent the family, and they visited Jack at the hospital in New Orleans. Thomas Berry's investigator obtained photographs of Jack's burns, copies of which were displayed to the jury at this trial with telling effect. Thomas Berry has practiced civil trial law for over 20 years in Mississippi, and had tried over two hundred cases at the time he undertook this representation. At trial, he explained in detail the investigation he undertook and the basis for his recommendation that the Berrys accept the settlement offer proposed by the County.
 
 
 11
 Thomas Berry was aware at the outset that Jack might have causes of action against Hancock County and its officials or against the mattress manufacturer. His investigator learned that several stories of the origin of the fire were circulating.[3] He learned that the mattress had flamed up while Berry was on it, casting serious doubt whether, despite its specifications, the mattress was fire-retardant. He thought he could make a good case against the mattress manufacturer based on product liability, in which "all you have to prove is defect and damages." He rated Berry's chance of success in a suit against the County as much more problematic.
 
 
 12
 At some point between September, 1981, and April, 1982, when the covenant not to sue was executed, Thomas Berry received a settlement offer on behalf of Hancock County. Until then, he had decided not to pursue the County too aggressively with his investigation nor even to suggest that the County might be a target. He feared that any other course might prejudice Jack's pending criminal charges on various felonies.[4] In return for a release from liability, the County offered to pay Jack's past and present medical bills, to reduce the arson charge to destruction of public property and to recommend a probated sentence on the other four felonies. The County's attorney further advised Berry that it would turn over a mattress identical to the one which had burned, and it would give him its investigation file on the incident.
 
 
 13
 Thomas Berry did not see a need for immediate action, in part because he felt that Jack would not be a good witness at trial while he still appeared young, rebellious, and cocky. Thus, some delay might help their case.
 
 
 14
 Thomas Berry recommended the settlement to James Berry, Jack's father. At least $27,000 in medical bills had accumulated and gone unpaid prior to the settlement. Thomas also believed that his investigation would be easier and Jack's chances at trial enhanced if he was not serving time in Mississippi's penitentiary, 300 miles away, prior to or during the civil trial. Thomas Berry testified that he discussed the settlement with James, at least. Thomas Berry also discussed the potential settlement with two criminal defense lawyers who had been appointed to represent Jack in his pending felony cases. The defense counsel both believed that the settlement was in Jack's best interest for the purpose of disposing of the felony offenses.
 
 
 15
 One of Jack's defense lawyers, Yvonne Sills Chapman, specifically discussed the ramifications of the possible settlement for his felony charges. She recommended to him that he accept the settlement.
 
 
 16
 Thomas Berry received a draft release from the attorney for the County, and, with the intent of preserving the family's right to pursue the mattress manufacturer, he revised it into a covenant not to sue Hancock County or its agents. James Berry, Jack Berry and Bonnie Jean Berry (Jack's mother), executed the Covenant Not to Sue, as did a representative of the County. Pursuant to the agreement, the County eventually paid some $30,000 in medical bills, and it gave Thomas Berry a facsimile mattress. The County recommended that the state criminal court sentence Jack to probation on his felony offenses, and it reduced the felony arson charge to the lesser offense of destroying government property. This charge, in turn, was "passed to the files," a Mississippi practice that defers prosecution indefinitely. The state trial court was not bound by the County's recommendation, but it did sentence Jack to "shock probation," for which he received a token incarceration in the penitentiary, followed by supervised release.[5]
 
 
 17
 From all appearances, Thomas Berry represented the Berry family competently and astutely. He discussed with Jack's criminal attorneys the implications of obtaining probation on felony charges that might otherwise have garnered a lengthy sentence in the Mississippi penitentiary. Neither of those attorneys disputed the benefit Jack obtained by being sentenced to probation. But for the testimony of the Berry family, there would be no question that the settlement agreement was rational and furthered Jack's and his parents' personal interests.
 
 
 18
 The only evidence that could undermine the "voluntariness" of the Covenant Not to Sue derives from the Berry family members. Mrs. Berry asserted that she relied completely on her husband's advice, and that no one ever explained to her that as a consequence of executing the Covenant Not to Sue, Jack could not sue the sheriff or Hancock County. James Berry admitted that he talked to his lawyer Thomas Berry several times about the settlement agreement, but he stated that he did not understand what the Covenant Not to Sue meant. According to James, he only really came to understand it after the new lawyers were retained to pursue Jack's Sec. 1983 lawsuit. He understood that the County would supply them with a mattress identical to the one that burned and would cooperate in a suit against the manufacturer.
 
 
 19
 Jack Berry did not discuss the settlement agreement with Thomas Berry in detail. Thomas observed that he and Jack experienced a personality conflict. Jack did, however, understand that the County would pay his medical bills and that he would receive a probated sentence for his felony offenses.
 
 
 20
 The family, in short, uniformly asserted that they did not know that the "Covenant Not to Sue" which they signed would foreclose Jack from suing Hancock County and its officials over the fire.
 
 
 21
 What they did not testify to is, in this context, nearly as significant as the protestations of ignorance. Jack never said that he was innocent of the felony offenses with which he had been charged. Three of these were pending before the fire, one was indicted months after the fire, and they involved separate crimes committed at separate dates and locations. No one in the family said that his or her signature was involuntary. None of the Berrys said that they were coerced into signing the Covenant Not to Sue. None said that if faced again with the alternatives of signing the settlement agreement or allowing Jack to stand trial on the felony charges and being responsible for the medical bills, he or she would not sign such an agreement.
 
 
 22
 The focus of our inquiry thus shifts to whether public policy permits a finding of "involuntariness" simply because, at worst, the Berrys' attorney did not sufficiently communicate to them the meaning of the Covenant Not to Sue. For the following reasons, we conclude that the agreement was not "involuntary" as is contemplated by Rumery.
 
 
 23
 First, neither Jack nor his parents were coerced to sign the settlement agreement. Rumery repeatedly refers to the possibility that an individual may be coerced into foregoing a valid Sec. 1983 claim by a misuse of the prosecutorial function. No such misuse was alleged here. In fact, it is hard to conceive how, apart from the filing of the arson charge, the county prosecutor could have twisted Jack's criminal predicament to thwart the filing of a Sec. 1983 suit. Jack had not yet filed suit nor even threatened to do so. Moreover, three of the felony offenses with which Jack was charged predated the fire. The essence of coercion, in any event, is the individual's sense that he is being forced to give up his Sec. 1983 claim because of the criminal charges. In this case, however, the Berrys assert that they did not even know that the Covenant Not to Sue embodied such a trade-off. They could not have been coerced.
 
 
 24
 Second, there was no subjective involuntariness or unwillingness expressed at the time the Berrys entered into the Covenant Not to Sue. Each of them realized certain benefits that were being obtained from the agreement. The County carried out its part of the agreement, and Thomas Berry continued to represent the family until Jack Berry hired other counsel.
 
 
 25
 Third, the Berrys did not lack representation by competent counsel. Thomas Berry and two criminal attorneys, David Necaise and Yvonne Sills Chapman, took part in the representation. The Berrys have never sued their counsel for malpractice. In criminal and habeas corpus cases, we assume that an individual defendant is generally bound by his competent counsel's advice and knowledge. See Jones v. Estelle, 722 F.2d 159, 162-67 (5th Cir.1983), cert. denied 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984). We see no reason why such a rule should not exist in this analogous situation.
 
 
 26
 Fourth, the agreement Thomas Berry reached with the County reflected "a highly rational judgment that the certain benefits of escaping criminal prosecution exceed[ed] the speculative benefits of prevailing in a civil action." Rumery, 480 U.S. at 393-95, 107 S.Ct. at 1193. In Rumery, all the plaintiff received, in exchange for dismissing his Sec. 1983 claim, was a dismissal of the charge against him. Here, by contrast, the Berry family received the benefit of over $27,000 in medical expenses, a mattress that presumably could be used to investigate the claim against the manufacturer, County cooperation in a product liability lawsuit, and a probated sentence for four felony offenses.
 
 
 27
 Fifth, the Covenant Not to Sue is hardly couched in obscure technical phrases. It states that each of the Berrys
 
 
 28
 "hereby forever agree not to sue Hancock County, Mississippi, Hancock County sheriff Ronald A. Peterson, and any and all agents, servants and employees of Hancock County, Mississippi for any and all claims arising out of that certain incident which occurred on or about the 27th day of August, 1981, at or about 8:00 o'clock p.m. when Jack Berry sustained certain severe burns to his body while an inmate of the Hancock County jail. Further, the undersigned forever agree to refrain from filing any and all claims against Hancock County, Mississippi, ... for damages and/or medical expenses which now exist or will be determined to exist in the future as a result of the said incident."
 
 
 29
 It may be granted that James Berry had a tenth-grade education, and his wife and son shared a modest educational background. Nevertheless, they were all literate. The quoted language appeared in the first half of the Covenant Not to Sue, and the entire document is slightly over a page long, excluding notary acknowledgements. The meaning of the document was not hidden from the Berrys.
 
 
 30
 Sixth, the testimony at trial, although incomplete on this point, suggested that the County's attorneys did not take special pains to explain to the Berrys the significance of the Covenant Not to Sue. We do not view this circumstance as significant. The principal dealings were conducted, as they should be, between Thomas Berry and the County attorney. Because the Berrys were represented by counsel, the County had no duty to discuss the terms of the Covenant Not to Sue independently with them.
 
 
 31
 In sum, if there is any serious question regarding the scope or intent of the Covenant Not to Sue, it might be the subject of a malpractice action between the Berrys and their former counsel. Nothing in the overall settlement agreement, nor in its manner of presentation to the Berrys was designed to prevent them from making their free will choice in the onerous circumstances which faced Jack and the family. The Covenant Not to Sue was not coerced, and its execution was not "involuntary" in the sense that public policy should demand its revocation.
 
 B. Prosecutorial Overreaching
 
 32
 As Rumery explains it, there is a possibility that a prosecutor may be influenced by a pending or threatened Sec. 1983 claim to handle charges against an accused differently than he would otherwise. The prosecutor might arbitrarily worsen the defense status of the accused or, in a worst case, might even trump up criminal charges in order to coerce a settlement of the civil rights action. In Rumery, as the majority noted, the only evidence of such overreaching was the settlement-release agreement itself. So it is here. Jack Berry has not argued that the prosecutor inflated, mishandled or trumped up the very serious charges that were pending against him at the time he executed the Covenant Not to Sue. Indeed, the only charge stemming from the fire was that of arson. Three other felony charges, related to burglary and property crimes, were already pending against Berry when the fire occurred. Thus, while we might scrutinize carefully a settlement-release agreement in which a prosecutor traded off a particular charge against the civil rights claim brought relating to that charge, because an opportunity for manipulation might exist, no such opportunity presented itself here.
 
 C. The Public Interest
 
 33
 Our final consideration, according to Rumery, is whether the public interest is served by the settlement agreement reached here, and conversely, whether its enforcement disserves any public policy. The balance of interests favors enforcement of the settlement agreement.
 
 
 34
 From Jack Berry's standpoint, although he gave up the right to sue on a Sec. 1983 claim against Hancock County and its agents, he maintained the claim against the mattress manufacturer. His opportunity was enhanced to the extent that the County agreed to cooperate in that endeavor. He obtained the payment of significant medical bills, which neither he nor his parents could otherwise have afforded to pay.[6] The benefits he achieved in the pending criminal matters were considerable, and they caused his defense counsel to recommend that he accept the settlement agreement. Finally, although Jack did achieve a sizeable judgment in the court below, we are not able to state decisively that his counsel Thomas Berry did not drive an effective, rational bargain with the County in reaching the settlement and agreeing to a Covenant Not to Sue. The deficiency, if any, stems from Jack's misperception of the agreement rather than from any inherent flaw in the agreement itself.
 
 
 35
 Hancock County likewise profited from the settlement agreement without, forsaking its responsibility to Berry or to its citizens who are entitled to zealous law enforcement. The County paid Berry's medical bills, for which it might not have been responsible if Jack had been found guilty of arson. It paid them much quicker than it would have done had Jack chosen to persist in his lawsuit. The various felony charges pending against Jack were not inconsequential, but, unlike the deal struck in Rumery, the County did not dismiss those charges. It agreed to recommend probation, a sensible result when Jack's youth is taken into consideration. The County also saved its taxpayers' money by not having to go to trial on any of those charges. In short, the County's handling of this matter was not skewed unfairly toward the interest of its officials while disadvantaging Berry or the public.
 
 
 36
 Pursuant to the tripartite considerations enunciated in Rumery for evaluating settlements of Sec. 1983 claims in the face of pending criminal prosecution, we find that the Berrys' Covenant Not to Sue was consistent with the public interest and enforceable. The covenant provided a complete defense to Hancock County and its officials.
 
 
 37
 The judgment of the district court is REVERSED.
 
 
 38
 GARZA, Circuit Judge, dissenting.
 
 
 39
 I respectfully dissent from the majority reversing and, in fact, rendering a verdict in favor of the defendants in this case. I would reverse and remand for a new trial.
 
 
 40
 I have no quarrel with the majority's view of the law that covers this case. I think the majority's view of the law after the case of Town of Newton v. Rumery, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), is correct.
 
 
 41
 The covenant not to sue in this case, which was part in writing and part in oral promises on the part of the defendants, and which the jury found existed, can be upheld as the majority declares, if the parties entered into it voluntarily, there was no prosecutorial overreaching, and in conformity with the public interest.
 
 
 42
 The problem I have is that the majority has taken a seat inside the jury box and has replaced the jurors in this case in deciding mainly the issue of voluntariness of the Berry's signing that part of the covenant not to sue in which the defendants agreed to pay the hospital bills of Jack Berry, which they would probably have had to pay regardless of whether there was a suit or not.
 
 
 43
 Voluntariness to me necessarily includes an understanding of what the agreement is about by the parties that enter into it. All of the Berrys, the father, the mother and the son, who is the plaintiff in the present case, testified that they did not understand that the paper they were signing would not give them a right to sue under Sec. 1983 or under state law on negligence of the sheriff. The jury that heard the testimony in this case and saw the witnesses that testified could well have decided that the covenant not to sue was not entered into voluntarily since there was not a meeting of the minds on the effect of the covenant they were signing.
 
 
 44
 Like the majority, I agree that whether to uphold such a covenant not to sue under Sec. 1983, or for negligence under state law, the question of voluntariness is a question of fact. That the question of prosecutorial overreaching is mainly a question of law, as is the question of whether it is good or not for the public interest. As stated by the majority in their footnote, two (2), there may be subsidiary fact issues raised which are pertinent to the determination of prosecutorial overreaching or public interest and the court might send such issues to the jury, but that it retains responsibility on the ultimate criteria.
 
 
 45
 The court below asked the jury whether the covenant not to sue between the Berry family and Hancock County "should be enforced". The lower court instructed the jury by this interrogatory to determine each of the Rumery criteria for enforceability--voluntariness, prosecutorial overreaching, and whether public policy favored the agreement. I also agree with the majority that this was error.
 
 
 46
 Unlike the majority, I do not agree that the jury should have passed only on the question of voluntariness.
 
 
 47
 The issue of prosecutorial overreaching was still present after young Berry was severely burned. The county charged him with arson in setting the fire which injured him. Even at the time of the trial in this cause, the county was still insisting that he was guilty of arson and the first question that was asked by the court below was whether or not Jack Berry had set the fire, and the jury answered, "No." The court could very well have believed that, by that finding, the jury meant to tell the county that they had overreached their prosecutorial conduct by the filing of the charge of arson against Jack Berry. I cannot say for sure that the only issue in this case was voluntariness, but neither can the majority.
 
 
 48
 The jury in this case found that the defendants had been negligent under the law in not providing this young plaintiff with a safe place while incarcerated. Not only did the jury find for the plaintiff in his charge that his constitutional rights had been violated, but also found negligence under state law.
 
 
 49
 Because of the erroneous interrogatory above stated, I would remand the case for a new trial so that the court below can submit to the jury a question on voluntariness, a question on whether or not the filing of the arson charge was to encourage the signing of the covenant not to sue, and any other issues that the court could or should have submitted in this case. The court below should also make those findings which he alone can make on the three prongs of Rumery, supra.
 
 
 
 [1]
 At trial, counsel for Berry objected to this issue as asking the jury to decide questions of law. On appeal, the parties have switched sides, and counsel for defendants now raises this objection, while Berry defends the form of the interrogatory. We have found no authorities in point
 
 
 [2]
 There may be subsidiary fact issues raised pertinent to the determination of prosecutorial overreaching or public interest. A court might send such issues to the jury, but it retains responsibility on the ultimate criteria
 
 
 [3]
 At this trial, the jury found that Jack Berry did not start the fire. Two witnesses testified, however, that as he was carried from the jail on a stretcher after being burned, he stated that he did it "to get attention." Jack's trial testimony equivocates on whether he made this statement. Other testimony was conflicting. Jack was indicted for arson
 
 
 [4]
 Jack was charged by indictments with burglary on July 16, 1981; burglary of a dwelling on July 16, 1981; receipt of stolen property on June 1, 1981; and grand larceny on February 1, 1982. The arson charge was separate
 
 
 [5]
 It is not material to the issues before us, but the denouement of the Berry family's relation with Thomas Berry should be noted. Sometime after Jack Berry served his stint in the penitentiary for shock probation, he visited Thomas Berry's office and vigorously argued that he should be able to sue Hancock County and the sheriff. Thomas disagreed. Jack hired other lawyers to represent him in the Sec. 1983 lawsuit. Thomas Berry voluntarily turned over his file, the mattress, and the photographs of Jack's burns. Because Thomas had been retained by James and had never entered into a formal representation contract with Jack, he received no payment for his services. The record does not reflect what, if anything, happened on the product liability claim
 
 
 [6]
 Although it was contended that the County would have had to pay his medical bills anyway, this is hardly a clear cut proposition, especially if Berry had been found to have started the fire himself