**Diane WOODS, Appellee,**

v.

**Jay RHODES; City of Sioux City, Iowa, Appellants.**

**No. 92–2052.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1992.

Decided June 1, 1993.

Rehearing and Rehearing En Banc Denied July 27, 1993.

Timothy A. Scherle, Sioux City, IA, argued (James L. Abshier and Kerrie M. Plummer, on the brief), for appellants.

Robert L. Sikma, Sioux City, IA, argued (Patrick C. McCormick, on the brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

MAGILL, Circuit Judge.

We here discuss 42 U.S.C. § 1983 excessive force claims preceded by a release of civil claims as a quid pro quo for dropping criminal charges. It is a case of first impression in this circuit. The City of Sioux City, Iowa, and the other individual appellants (collectively the City) appeal a jury verdict in favor of Diane Woods, in which she recovered damages for intentional infliction of emotional distress and assault and battery. In the district court, the City moved for summary judgment on the ground that Woods had voluntarily signed a valid, binding release which obligated her not to pursue any legal actions against the City. The district court denied the summary judgment motion. This denial of summary judgment is also on appeal. We hold that the release was valid as a matter of law and the City's summary judgment motion should have been granted by the district court. Accordingly, we reverse the district court's decision to deny summary judgment and remand with instructions to dismiss the case.

## I. BACKGROUND

In the early morning hours of March 18, 1987, Diane Woods had an altercation with members of the Sioux City, Iowa, police department. The litigants have vastly different stories about what happened. According to Woods, Officer Jay Rhodes and other members of the Sioux City police department assaulted her for no reason, beat her severely, and humiliated her with brutal treatment and derisive, obscene remarks.

According to the City, Officer Rhodes observed Woods speeding and attempted to stop her. Rhodes, with the overhead lights in his marked squad car on, followed her for several blocks turning several corners in the process. During this period of pursuit, Woods refused to pull over. She finally stopped her vehicle in the alley behind her residence. At this point, Rhodes contends Woods exited her vehicle and refused to stop when he requested that she do so. Woods then became abusive and violent. According to Rhodes, he attempted to place Woods under arrest, but she was belligerent and uncooperative. At trial, Rhodes testified that she smelled of liquor. Rhodes used his walkie talkie to call for reinforcements to help him subdue Woods. Ultimately, it took four officers to get Woods under control and get her hands cuffed behind her back. Rhodes freely admits that a struggle ensued, but only as a means of arresting and controlling Woods who resisted all attempts to cooperate and struggled continually with the officers.

Ultimately, the officers on the scene placed Woods in a paddy wagon and took her to the Woodbury County Jail. At the jail, she was given a variety of field sobriety tests. The

officer who administered the tests testified at trial that Woods' speech was slurred and she failed some of the tests. Woods refused to take a breath alcohol test. The police booked Woods on six charges: speeding, eluding, failure to obey, assault, operating a motor vehicle while intoxicated, and two counts of disorderly conduct.

Woods initially engaged an attorney named Dennis Mahr to represent her on the criminal charges. She terminated her relationship with Mahr and then engaged attorney Jack Faith to represent her. Faith is an experienced criminal attorney in the Sioux City area. Faith obtained photographs taken of Woods two days after March 18 allegedly showing the bruises she suffered because of the police's conduct during the struggle. In his representation of Woods, Faith showed the pictures to Assistant Woodbury County Attorney Raymond Reel, the prosecuting attorney handling Woods' criminal charges.[1] In light of the pictures and what Woods had told him, Faith's negotiating position with Reel was that Woods had been beaten by the police and in the interests of justice, the charges against Woods should be dropped. Reel initially refused.

Later, Faith learned that Officer Rhodes had moved a considerable distance away from the Sioux City area. Knowing that a successful prosecution would be difficult without Rhodes' testimony, Faith again asked Reel to drop the charges. After further negotiations, Reel offered to dismiss the pending criminal charges if Woods signed a release. Reel drafted the release document stating, among other things, that Woods would agree to "release, acquit, and forever discharge" Sioux City and the police department (including Officer Rhodes and many other named individuals) from "any and all liability whatsoever" for any "injuries, damages, claims or causes of action whatsoever whether known or unknown" regarding the events of March 18, 1987. The document states that Woods agrees "[t]hat she is executing this Release solely in reliance upon her knowledge, belief and judgment and that

of her attorney, and not upon any representations named by the party released or others in their behalf." The release further states, "I have read the foregoing Release, and understand its terms and freely and voluntarily sign the same." The document was one page long and was written in clear, straightforward language.

After negotiating with Reel, Faith agreed to present the release to his client, Woods. After considering the document and consulting with Faith over a period of approximately two months, Woods signed the release on September 15, 1987, almost six months after the initial incident with the police.

In February of 1989, Woods filed a complaint in United States District Court for the Northern District of Iowa alleging 42 U.S.C. § 1983 violations by the police and the City of Sioux City in connection with the incident on March 18, 1987. In the complaint, she also alleged pendent state tort claims. The defendants moved for summary judgment based on the release. The district court denied the motion, ruling it could not state that the release was voluntary and there was no prosecutorial overreaching.

After a trial, the jury returned verdicts in favor of the City on two counts concerning the § 1983 claims and for a state law claim of false arrest. The jury also returned verdicts in favor of Woods on state law claims of assault and battery and intentional infliction of severe emotional distress and awarded her $1 punitive and $200,000 compensatory damages.

## II. SUMMARY JUDGMENT EVIDENCE

When the City moved for summary judgment, the evidence the court considered consisted of depositions of Diane Woods, Jack Faith, and Raymond Reel; a copy of the release; copies of two letters sent by Faith to Woods regarding the release; and Woods' typed recollection of the events of March 17 and March 18, 1987.

---

1. The Woodbury County Attorney's office serves as the criminal prosecutor for the Sioux City municipality.

In his deposition, Reel testified as to his motivation in obtaining the release. Reel explained that Officer Rhodes had moved to another state somewhere in the South.[2] Reel stated that at the time he proposed the release, Rhodes was no longer available in Sioux City to serve as a witness in prosecuting Woods for the crimes with which she was charged. According to Reel, Rhodes would be a critical witness in any prosecution of Woods, and without his testimony, the charges against Woods would be difficult to prove. Reel testified that he was reluctant to pay the costs of flying Rhodes back to Sioux City, and that if he obtained a release from Woods, he could in good conscience dismiss the charges against her. He explained further: "My motive was I didn't want her coming back into court saying, 'Look, here, I wasn't guilty of anything. The state dismissed all these charges against me.' And I did not want that to happen, so I asked her to sign a release. That was the first, only and last release I used while in Woodbury County."

On cross-examination, Reel was asked whether one of his concerns in obtaining the release was to protect the officers from civil liability. He replied, "That's not—certainly not a primary concern of mine." When asked whether he was concerned about potential civil liability for the City when he obtained the release, he responded that he was indeed concerned about the City's potential civil exposure. Reel also indicated he did not recall talking to Woods during the months following the incident when she was represented by counsel, but he could not unequivocally say that he did not. In Reel's words: "I can say I don't believe I spoke with her. . . . [T]he possibility is yes, I did, but I don't recall doing it." Reel testified further that he did not know of any other law enforcement official who had contacted Woods after March 18.

In her deposition, Woods testified that she received a phone call sometime during the month of June or July from someone who identified himself as being from the county attorney's office. According to Woods' testimony, the man "said he would personally bring Jay Rhodes back and he would personally see that I was—it would go to the full extent of the law and that he would see that I went to jail if I did not sign the release." Woods testified that she did not catch the name of the individual who called her. She further testified that both of her attorneys, Mahr and Faith, had explained to her the possibility she might go to jail if the charges against her were pursued. When asked if the alleged county attorney in the phone call had told her anything that she did not already know, Woods replied, "No."

When Woods was asked about her motivation for signing the release, she responded she was threatened with the possibility of going to jail and threatened with the possibility that Officer Rhodes would come back to testify against her. She stated she was personally afraid of Rhodes and she feared another beating. Woods testified further that pursuing a lawsuit would have been expensive and she did not want to jeopardize her family's security. She stated the financial impact of a lawsuit was a real concern for her. When asked about other factors that influenced her decision to sign the release, Woods testified she was embarrassed and humiliated because she had been arrested for driving while intoxicated, and she knew the criminal charges would be dropped if she agreed to the release.

In his deposition, Faith discussed his representation of Woods. Faith testified he had represented Woods before the Iowa Department of Transportation, and the administrative decision had been to suspend Woods' driving privileges because of her refusal to submit to alcohol content tests on March 18, 1987. Faith further testified he represented Woods in the negotiations with Reel which resulted in the dropping of the criminal charges.

Faith testified he told Woods he believed the release proposed by Reel was of questionable validity because he believed it was void as against public policy. He also testi-

---

2. At the time of his deposition, Reel indicated that he believed Rhodes had moved to Arkansas. At trial Rhodes testified that he had, in fact, moved to Alabama because his wife's employer had transferred her there.

fied he advised Woods, as a practical matter, she had to consider it an absolute and final release. Faith stated in his deposition Reel told him the City would fly Rhodes back if Woods did not accept the agreement. In a letter dated July 23, 1987, Faith wrote to Woods regarding the release:

> Mr. Raymond Reel has contacted me on this date inquiring whether or not you are willing to accept this offer. If no acceptance is made by July 27, 1987, he intends to acquire the attendance of Mr. Rhodes, who is presently residing in Alabama. Mr Reel indicates that he will purchase an airline ticket for his flight to testify at these proceedings.

In a letter of August 17, 1987, Faith again wrote to Woods, enclosing a copy of the release, and explained to her all of the criminal charges against her would be dropped in exchange for her signing the release. On September 15, 1987, in the presence of Faith, Woods signed the release. All criminal charges against Woods were dropped shortly thereafter.

### III. DISCUSSION

■ We review decisions on summary judgment under the same standards as the district court. *Kegel v. Runnels*, 793 F.2d 924, 926 (8th Cir.1986). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment should be granted when "the moving party has established the right to a judgment with such clarity as to leave no room for controversy." *Vacca v. Viacom Broadcasting of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir.1989) (citation omitted). When the moving party produces credible evidence that establishes there is no genuine issue of material fact, the opposing party must produce specific facts demonstrating a genuine issue for trial. *Elbe v. Yankton Indep. Sch. Dist. No. 1*, 714 F.2d 848, 850 (8th Cir.1983). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We view all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513.

■ The Supreme Court held in *Town of Newton v. Rumery*, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), there is no per se rule against agreements whereby prosecutors drop criminal charges in exchange for a waiver of a citizen's right to sue. *Rumery*, 480 U.S. at 397, 107 S.Ct. at 1194. In determining whether releases are valid, courts must engage in a case-by-case analysis. *Id.* at 399, 107 S.Ct. at 1195. (O'Connor, J., concurring). Provided the release was voluntary, there was no prosecutorial overreaching, and the relevant public interests are not adversely affected, releases should be upheld. *Id.* at 398, 107 S.Ct. at 1194. This court has not yet addressed the validity of release-dismissal agreements in the context of criminal and civil rights cases. *Rumery* and several other circuit court cases have elaborated on the three elements of voluntariness, prosecutorial overreaching, and public policy.

### A. Voluntariness

■ Courts have considered several factors in determining voluntariness. These factors include: the sophistication of the signer, *Rumery*, 480 U.S. at 394, 107 S.Ct. at 1192; *Lynch v. City of Alhambra*, 880 F.2d 1122, 1127 (9th Cir.1989); cost/benefit considerations by the signer, *Rumery*, 480 U.S. at 394, 107 S.Ct. at 1192; *Berry v. Peterson*, 887 F.2d 635, 640 (5th Cir.1989); and the circumstances of the signing, i.e., whether the signer is in custody at the time of signing, *Rumery*, 480 U.S. at 394, 107 S.Ct. at 1192; *Lynch*, 880 F.2d at 1127; *Hall v. Ochs*, 817 F.2d 920, 922 (1st Cir.1987). For example, in *Hall* the plaintiff was forced to sign the release in order to get out of jail. The court held that this signing was clearly involuntary. *Id.* at 923.

Additional factors in determining voluntariness are: whether the signer was represented by counsel, *Rumery*, 480 U.S. at 394, 107 S.Ct. at 1192; *Berry*, 887 F.2d at 639–40; *Lynch*, 880 F.2d at 1127; the time with which the signer considered the document, *Rumery*, 480 U.S. at 394, 107 S.Ct. at 1192;

*Lynch,* 880 F.2d at 1127; and whether the signer's attorney drafted the document, *Rumery,* 480 U.S. at 390, 107 S.Ct. at 1190; *Lynch,* 880 F.2d at 1127. Courts also consider whether the signer expressed any unwillingness, and whether the release is clear on its face. *Berry,* 887 F.2d at 640. The *Berry* court noted "[v]oluntariness is the only possible fact issue in the *Rumery* formulation.... The other two criteria are issues of law involving policy choices made against the background of the court's familiarity with the criminal justice system, and they must be determined by the court." *Id.* 887 F.2d at 637.

■ Even assuming it is a fact question, reasonable minds could not dispute that the release in this case was executed voluntarily. Woods offered no evidence of any unwillingness at the time she signed the document. As her deposition reveals, Woods was well aware of the benefits of signing the release and she knew the consequences if she did not agree to sign. Woods was represented by counsel who acknowledged the legal effects of the release and was clearly capable of assessing the advantages and disadvantages of the release. Although the release was not drafted by her own attorney, Woods had weeks to consider the document and throughout that time she was in consultation with her counsel. She was not in custody at the time the release was executed and in fact was in the presence of her attorney when she signed it suggesting there was no coercion. Furthermore, the release was completely clear and unambiguous on its face.

■ The trial court placed much weight on the telephone call Woods allegedly received from the prosecutor's office. However, according to Woods' own admission in her deposition, this telephone call, even assuming it occurred, did not communicate to Woods anything she did not already know. Woods testified in her deposition that her first attorney, Mahr, had explained to her she could possibly serve jail time for the criminal charges pending against her. Woods engaged her second attorney, Faith, in April of 1987, and he also informed her of the possibility of going to jail and the possibility of Rhodes testifying against her. The county

attorney was perfectly entitled fully to prosecute Woods on the legitimate criminal charges, and Woods knew she could expect prosecution and possible conviction if she chose not to sign the release. We are unable to agree with the trial court's conclusion that this alleged conversation affected her voluntariness. In considering all the relevant factors in total, we hold reasonable minds could not dispute her signing was voluntary.

## B. Prosecutorial Overreaching

■ In interpreting the requirement that there be no prosecutorial overreaching, courts have asked whether there are legitimate prosecutorial reasons for the release. Examples of acceptable prosecutorial concerns include: the cost and burden of litigating lawsuits, *Rumery,* 480 U.S. at 395, 107 S.Ct. at 1193; *Hammond v. Bales,* 843 F.2d 1320, 1322 (10th Cir.1988); docket control and the efficient resolution of criminal charges, *Rumery,* 480 U.S. at 395, 107 S.Ct. at 1193; *Hammond,* 843 F.2d at 1322; and the avoidance of questionably valid civil rights litigation, *Rumery,* 480 U.S. at 395, 107 S.Ct. at 1193. Additional factors bearing on prosecutorial overreaching include the nature of the criminal charges, *Rumery,* 480 U.S. at 401, 107 S.Ct. at 1196 (O'Connor, J., concurring); and whether prosecution was threatened before or after the prosecutor learned of the civil rights litigation, *Lynch,* 880 F.2d at 1129.

■ Again, there can be no controversy about prosecutorial overreaching under these criteria. There were legitimate, independent prosecutorial reasons for the release. The cost of prosecuting Woods was greatly increased because the principal prosecution witness had moved from the area. Accordingly, in the interests of costs and docket control, the City decided it would be a more efficient resolution of the dispute to strike this bargain with Woods. Furthermore, the criminal charges against Woods were filed by the police, not the prosecutor's office, within hours of her apprehension. There was no evidence of retaliation when Woods was charged; the police were acting properly as law enforcement officials and not in response to either a real or threatened

civil rights suit. The specter of Woods' prosecution arose as soon as charges were filed against her on March 18, 1987. What Woods perceives as the "threat" of prosecution was actually nothing more than the likelihood faced by all arrestees that their charges will be advanced to their ultimate conclusion. The likelihood of her legitimate prosecution cannot constitute overreaching, nor can it render her acceptance of the release involuntary.

The district court questioned the validity of the release because it believed that the City's only motivation was to shield the defendants from civil liability and this suggested possible prosecutorial overreaching. We disagree with the district court's interpretation that the prosecutor had such a single-minded purpose. In his deposition, county attorney Reel stated that his motivation was to get rid of the case because it would be difficult to prosecute without Rhodes as a witness. This is a legitimate prosecutorial concern. In fact, it was also concern over a witness that motivated the prosecutor in *Rumery* to execute a release-dismissal agreement.[3] Reel did admit that he was concerned about the City's civil liability, but *Rumery* instructs that the costs and burdens in defending civil suits are appropriate for prosecutors to consider. *Rumery*, 480 U.S. at 395, 107 S.Ct. at 1193. After considering all the relevant factors, we hold that the prosecutor's decision was acceptable and conclude as a matter of law there was no overreaching.

## C. Public Interest

■ In determining whether a release adversely affects the public interest, the *Rumery* Court held that courts must examine the policies both in favor and against such releases. The *Rumery* Court recognized that such release-dismissal agreements may "tempt prosecutors to bring frivolous charges, or to dismiss meritorious charges, to protect the interests of other officials," and the Court acknowledged that such motivations were unethical. *Rumery*, 480 U.S. at 395, 107 S.Ct. at 1193. However, the Court also acknowledged the burdensome costs of defending marginally meritorious civil rights claims weighed in favor of releases. The Court wrote, "[p]reparation for trial, and the trial itself, will require the time and attention of the defendant officials, to the detriment of their public duties.... This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest." *Id.* at 395–96, 107 S.Ct. at 1193. The *Rumery* Court also noted that courts normally must defer to prosecutorial decisions. *Id.* at 396, 107 S.Ct. at 1193. Moreover, the strength and importance of a case and the allocation of scarce criminal justice resources are appropriate policy factors prosecutors may consider in determining whether to proceed. *Id.* The Court concluded the mere opportunity for the prosecutor to act improperly does not compel the conclusion that release-dismissal agreements are invalid per se. *Id.* at 397, 107 S.Ct. at 1194.

■ In examining the public interests in this case, we note that the criminal prosecution against Woods would have been expensive to conduct and difficult for the prosecution to win. Reel stated in his deposition, "I mean, even with Jay Rhodes—I have no breath test. All I have—I don't have a videotape of the woman. I have the officer's statements about her behavior, her breath, her driving patterns . . . it would have been, you know, a tough case to win." The prosecutor appropriately considered the limitations of his resources and the likelihood of a successful prosecution.

Reel's concern about civil liability after the charges were dropped was also understanda-

---

3. The parallels between this case and *Rumery* are admittedly not perfect. In *Rumery*, the prosecutor dropped the criminal charges of witness tampering against the defendant because a prosecution of such charges would have involved testimony by a sexual assault victim. The testimony, while critical to the witness tampering charge, would have been traumatic for the witness. In light of the potentially traumatic effect on the witness, the charges were dropped. In this case, the witness, Rhodes, would not be testifying as to such a sensitive topic. However, the prosecutor still had legitimate concerns about Rhodes' availability due to his move and the cost of securing his presence. The cases are analogous to show that concerns about critical witnesses are independently valid reasons for obtaining release-dismissal agreements.

ble and appropriate. As he testified in his deposition, without Rhodes' testimony, he felt it was best to drop the charges. He then sought to secure the release to ensure that Woods would not sue the City. Reel feared that Woods might misconstrue the dismissal as an admission of police misconduct which could tend to encourage her to sue. Reel wanted to dispel that possibility. Given the circumstances, we believe Reel was acting in the public interest. We hold such concerns by the prosecutor were legitimate, and as a matter of law the release agreement did not contravene public policy.

This court has not addressed the release-dismissal agreement issue in the context of criminal charges and civil rights suits. However, we have decided many cases involving releases in other situations such as ADEA and ERISA settlements. *See Warnebold v. Union Pac. R.R.*, 963 F.2d 222 (8th Cir.1992); *Leavitt v. Northwestern Bell Tel.*, 921 F.2d 160 (8th Cir.1990). The most important general concern bearing on the enforceability of the releases in these two cases was whether the releases were knowing and voluntary. Additional factors included the signer's education and experience, his input into the settlement's terms, the clarity of the release language, the amount of time the signer had to consider the release before signing it, whether the signer knew his rights and the relevant facts, whether he consulted with an attorney, whether there was adequate consideration, and whether the signer was induced to sign by improper conduct. *Leavitt*, 921 F.2d at 162. *See Warnebold*, 963 F.2d at 223; *Pilon v. University of Minn.*, 710 F.2d 466 (8th Cir.1983). As a practical matter, this court's standard for the enforceability of releases in general is very similar to the standards enunciated by *Rumery* and its progeny. The case law from this circuit

serves to reinforce our conclusion that this was a valid, enforceable release.

This circuit has held that "parties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement ultimately proves to be disadvantageous." *Worthy v. McKesson Corp.*, 756 F.2d 1370, 1373 (8th Cir.1985). This is exactly what Woods is attempting to do. Woods voluntarily signed a release document knowing the advantages and disadvantages at the time. In consideration for the dropping of legitimate criminal charges against her, she agreed not to sue the City. She had counsel at her disposal and considered the release over a period of several weeks. Woods was aware of what she was gaining and giving up when she agreed to be bound by the release. She attempts now to revoke her agreement to the release because she perceives the disadvantages now outweigh the advantages. Woods is not entitled to such revisionism. Having made her bargain, she is now held to it.

## IV. CONCLUSION

We hold the release-dismissal agreement executed on September 15, 1987, was valid and enforceable. The City was entitled to summary judgment, the decision of the district court denying summary judgment is reversed, and the case is remanded to the district court with instruction to dismiss the case.

HEANEY, Senior Circuit Judge, dissenting.

We should not substitute our judgment in this case for that of the trial court and the jury. Diane Woods clearly presented sufficient facts both before and during trial to make a submissible case to the jury. A properly instructed jury[1] found that Woods

---

1. Jury instruction number 29 reads as follows:

    You have heard evidence in this case that Diane Woods signed a release (Exhibit 7) whereby the criminal charges against her would be dropped if she promised not to file a civil suit against the City of Sioux City or the defendant police officers.

    A release agreement of this nature is enforceable against the plaintiff if you find that plaintiff made a voluntary choice to sign the agreement.

    In determining the voluntariness of this release agreement you should consider the knowledge and experience of the criminal defendant in that case, Diane Woods, and the circumstances of the execution of the release, including, whether the defendant was counseled, the nature of the criminal charges that are pending against the defendant, the existence of a legitimate criminal justice objective for obtaining the release, and whether the release agreement was judicially su-

did not voluntarily waive her right to sue the defendants and awarded her $200,000 in compensatory damages and $1 in punitive damages.

I agree that *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), controls this case. There, the Supreme Court made it abundantly clear that whether a release in a particular case is valid or not depends on an examination of all of the circumstances. Justice O'Connor, whose vote was the deciding vote in *Rumery,* set forth a list of factors that bear on whether a release is voluntary and not the product of overreaching:

> The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect. The existence of a legitimate criminal justice objective for obtaining the release will support its validity. And, importantly, the possibility of abuse is clearly mitigated if the release-dismissal agreement is executed under judicial supervision.

*Id.* at 401–02, 107 S.Ct. at 1196 (O'Connor, J., concurring).

If we view the material submitted for summary judgment in the light most favorable to Woods and give her, as we must, the benefit of all inferences drawn therefrom, the district court was clearly correct in denying summary judgment. Woods stated her reasons for signing the release in a pretrial deposition:

> A. I was threatened. If I didn't sign it I would be going to jail. I was threatened

with the fact that they would bring Jay Rhodes back and I was terrified of him. I was informed that it would cost a lot of money to pursue a lawsuit. And I had no money without putting my family's security in jeopardy.

> Q. Who made the threat that you might spend time in jail?

> A. The first time it was Dennis Mahr that said I could go to jail for six months. I received a telephone call at home from a man that identified himself from the county attorney's office that said he would personally bring Jay Rhodes back and he would personally see that I was—it would go the full extent of the law and that he would see that I went to jail if I did not sign the release.

Woods Dep., April 4, 1989, at 10–11. Raymond Lester Reel stated in his pretrial deposition that "the possibility is yes, I did [contact Woods], but I don't recall doing it." Reel Dep., March 24, 1989, at 25. Reel even conceded that it would have been improper for him to have contacted Woods directly during the pendency of this case if she had an attorney. Reel Dep. at 25. Moreover, not only was the release-dismissal drafted by Reel, unlike in *Rumery,* it also appears to have been initiated by Reel as well. Reel Dep. at 12–15; Jack Faith Dep., March 2, 1989, at 8–9.[2]

Reel acknowledged in his deposition that one of his objectives in obtaining the release from Woods was the protection of the Sioux City police officers from any civil liability associated with her arrest. Reel Dep. at 6, 13–16. Strangely, Reel's concern only appears to have become manifest after he

---

pervised. In this case, the parties have agreed that the release was not judicially supervised. However, that is just one factor to be considered.

The defendants contend that the real reason for agreeing to the dismissal of the charges was to save the airplane expenses of bringing Officer Rhodes back from Alabama. The plaintiff contends that the defendants' real reason was to unfairly put her in a situation where she had to sign the waiver. The burden of proving the agreement's validity and enforceability rests on the defendants here.

If you find that plaintiff's decision to sign the agreement was not voluntary, then plaintiff will be entitled to damages if you have also found in her favor on one or more of the claims outlined above in these instructions. If you find that plaintiff's decision to sign the agreement was voluntary, then you must find in favor of the defendants on all counts.

2. Unlike the present case, the only evidence of prosecutorial misconduct in *Rumery* was the release-agreement itself. *Rumery,* 480 U.S. at 397, 107 S.Ct. at 1194.

viewed pictures of Woods's alleged injuries resulting from the arrest:[3]

Q. Okay. When you—when you first looked at those pictures, did they have any impact on you in terms of your thoughts towards disposition of the case?

A. Yes, yes. I think in looking at those pictures, I—Well, I grew apprehensive of the fact that this woman might come back into court and file an action against the city and the police officers for some type of mistreatment.

Q. Okay. And you thought to yourself ... "Oh, oh. I better get a release."

A. Well, I could have—That's basically what I could have been thinking, because at that time, we knew Jay Rhodes was not in town.

Reel Dep. at 13–14.

It may well have been that Reel was also concerned about the fact that a key witness would have to be flown in from Alabama to testify in the matter. This issue, however, was submitted to the jury, and the jury refused to excuse Reel's conduct on this basis. Certainly this expense paled in comparison to the severe injuries that Woods allegedly received at the hands of the officers.

The majority points out that Woods was represented at the time she signed the release. In contrast to *Rumery*, however, the county prosecutor prepared the release, and also unlike Rumery, Woods was an unsophisticated criminal defendant.

*Rumery* makes it clear that the nature of the pending criminal charge is also important because "the greater the charge, the greater the coercive effect." *Rumery*, 480 U.S. at 401, 107 S.Ct. at 1196 (O'Connor, J., concurring). Here, the combined charges against Woods were significant: (1) speeding, Iowa

Code Ann. § 321.285 (West 1985); (2) failure to obey a peace officer, Iowa Code Ann. § 321.229 (West 1985); (3) operating while under the influence of alcohol (OWI), Iowa Code Ann. § 321J.2 (West 1993); (4) assault, Iowa Code Ann. § 708.1(1) (West 1993); (5) disorderly conduct, Iowa Code Ann. § 723.4 (West 1993); and (6) eluding a peace officer in violation of the Municipal Code of Sioux City, Iowa.[4] Certainly the nature of these charges had an impact on the voluntariness of the release.

Finally, Reel made no attempt to mitigate the possibility of abuse by having the release-dismissal agreement executed under judicial supervision. In view of the gravity of the charges against Woods and in light of the serious injuries she allegedly suffered at the hands of the officers, judicial supervision should have been a necessary step.

While there is an important public interest in release-dismissal agreements that protect public officials from the substantial burdens of defending marginal and frivolous section 1983 lawsuits, *Rumery*, 480 U.S. at 395–96, 107 S.Ct. at 1193, that interest does not appear to be implicated in the case before us. There is also a strong public interest in the vindication of constitutional rights and the exposure of official misconduct. *Id.* Especially in today's society, exposure and vindication of excessive force claims against police officers serve important public interests. This, along with the public interest in the nature of the charges against Woods, when weighed against the prosecutorial reasons for obtaining the release (cost and difficulty of success), leads me to the conclusion that the interest in the enforcement of the release-

---

**3.** The plurality in *Rumery* notes, which the majority in the present case acknowledges, that release-dismissal agreements that tempt prosecutors to dismiss meritorious charges in order to protect the interests of other officials "properly have been recognized as unethical." *Rumery*, 480 U.S. at 394 n. 4, 107 S.Ct. at 1192 n. 4. Here, there is a question whether the charges against Woods were meritorious. *See* Reel Dep. at 14 ("Q. Are one of your concerns in the disposition of a case such as [Woods's] protecting the officers from civil liability? A. That's not—

certainly not a primary concern of mine. It's in those cases where I have to dismiss charges, that I believe are otherwise valid, that it does come in—at least it came into play that time.").

**4.** Woods also has a prior criminal record: in 1981 she was arrested for "another [OWI]" by the Sioux City Police Department, but was later found innocent, and in 1987 she was arrested for shoplifting for which she paid a fine. Woods Dep. at 27.

dismissal is outweighed by the harm to public policy from its enforcement.[5]

The district court's denial of the defendants' motion for summary judgment was clearly sustained by the record. Therefore, I respectfully dissent.

---

**5.** *See Rumery,* 480 U.S. at 392, 107 S.Ct. at 1191 ("[A] promise is unenforceable if the interest in its enforcement is outweighed in the circum- stances by a public policy harmed by enforce- ment of the agreement." (footnote omitted)).