Richard P. LYNCH, Plaintiff-Appellant,

v.

CITY OF ALHAMBRA; Joseph Molloy; Russell Siberling; David Barrett; Michael Fisher, Defendants-Appellees.

No. 88-5957.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1989.

Decided July 26, 1989.

Cecil Marr, Los Angeles, Cal., for plaintiff-appellant.

Scott H. Campbell, Los Angeles, Cal., for defendants-appellees.

Before FLETCHER, PREGERSON and LEAVY, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiff Richard Lynch appeals the district court's order dismissing his civil rights action brought under 42 U.S.C. § 1983 against the City of Alhambra and various city officials. We reverse and remand.

## I.

### FACTS

This dispute arises from the events surrounding the arrest of Richard Lynch on August 10, 1986. The facts recited are those alleged by Lynch. At approximately 2:20 a.m. on the date of the arrest, Lynch responded to a knock on his front door, finding a young woman who told him that someone had attempted to rape her at gun point. She asked Lynch if he could direct her to a bus stop. Lynch, a Deputy Marshal for the Los Angeles County Municipal Courts, said that he would help. He retrieved his Department identification and off-duty weapon from another room, but when he returned to the front door, he found that the victim had gone.

Lynch then drove around the block, looking for the victim. At approximately 2:30 a.m., Lynch noticed a police car behind him, and he pulled over to the curb.[1] Because his off-duty weapon was in the front seat, Lynch put both arms outside the driver's side window, and shouted: "Off-duty officer! I have a gun in the car."

Barrett then ordered Lynch to get out of the car and put his hands on the car. Lynch complied. At that time he heard another vehicle pulling up and stopping, and saw Barrett approaching from the right rear. Lynch then felt a blow to his groin area, and an arm around his neck. His left arm was pulled behind his back. He was then pushed roughly to the ground, resulting in abrasions to his face, knee and arm. He was handcuffed in that position with an officer kneeling on his lower back, while the police obtained his identification.

After several minutes on the ground, Lynch was picked up and placed into the back seat of a caged police car. Officer Barrett informed him that he was being booked for resisting arrest, a violation of California Penal Code § 148.[2] Lynch was taken to the police station, where he spoke to two police sergeants who informed him that he had been eliminated as a suspect in the felony for which he had been stopped. Lynch was told that he was free to leave after photographs of his injuries had been taken.

On August 11 or 12, Lynch complained to Police Department officials about his mistreatment, and was informed that Officer Barrett had probable cause for the stop, and that his injuries had resulted from his attempts to resist arrest. However, Lynch claims that he was led to believe that no charges would be filed. Later that month, Lynch requested a "Claim for Damages" form from the City Clerk, and received two numbered forms. Lynch's attorney also wrote three letters to the District Attorney's Office complaining of Lynch's treatment during his arrest.

---

1. The police car was occupied by Officer Barrett of the Alhambra Police Department. Barrett was apparently responding to a call involving the same crime that had come to Lynch's attention. Barrett had followed Lynch because his car roughly fit the description of the suspect's car.

2. That section provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician ... in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment." Cal. Penal Code § 148 (West 1988).

Lynch received no response to any of his complaints until October 14, 1986, when Deputy District Attorney William Holliman informed Lynch's attorney that he had found sufficient grounds to prosecute Lynch for resisting arrest, and that such prosecution would be initiated unless Lynch released his civil claims against the city.

Subsequently, Lynch's attorney drafted a release agreement that was approved by the District Attorney and City Attorney of Alhambra, and then sent to the plaintiff. After more than four weeks of consideration, Lynch signed the agreement. Eight months later, he initiated this action.

The defendants moved to dismiss the complaint, arguing that the release agreement bars litigation of the merits of Lynch's section 1983 claim. Lynch responded by arguing that the agreement violates public policy and therefore is unenforceable. On February 22, 1988, the district court dismissed the complaint. The court granted in part the defendants' motion for summary judgment, finding that Lynch voluntarily signed the release. However, the court did not decide whether the agreement violates public policy. Because Lynch had failed to allege any facts indicating prosecutorial impropriety, the district court dismissed the complaint without prejudice, allowing Lynch thirty days in which to refile. Lynch did not take advantage of this opportunity. Instead, Lynch appealed.

Because Lynch failed to cure the deficiency perceived by the district court within the period provided by the district court, the dismissal was converted to a final order of dismissal with prejudice, appealable under 28 U.S.C. § 1291. Lynch then filed a timely notice of appeal. We review *de novo* the district court's dismissal of Lynch's action. *See Gobel v. Maricopa County,* 867 F.2d 1201, 1203 (9th Cir.1989) (dismissal for failure to state a claim reviewed *de novo* ).[3]

---

**3.** Although the district court characterized its order as a dismissal, it arguably could be viewed as a summary judgment in favor of the defendants, based upon the release signed by

## II.

### DISCUSSION

The only issue in this appeal is whether the release signed by Lynch is enforceable. That issue must be decided largely by reference to the Supreme Court's decision in *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987).

In *Rumery,* the plaintiff was arrested by the Newton Chief of Police (ironically named Barrett) on the felony charge of witness tampering. Mary Deary, the complaining witness in an aggravated sexual assault case against David Champy, a friend of Rumery, had allegedly informed Barrett that Rumery had threatened her with retaliation if she did not urge the County Attorney to drop the charges against Champy.

Rumery promptly hired an attorney, who contacted the Deputy County Attorney responsible for prosecuting both Rumery's case and the sexual assault charge. After some negotiations, the attorneys reached an agreement under which the charges against Rumery would be dropped if Rumery agreed not to sue the town, its officials, or Deary for the harm caused by his arrest. Rumery's attorney drafted the agreement which was approved by the Deputy County Attorney and presented to Rumery. After considering the proposal for three days, Rumery signed the agreement.

Ten months later, Rumery filed a section 1983 action against the town and its officials, alleging that the defendants violated his rights by arresting him, defaming him, and imprisoning him falsely. The defendants filed a motion to dismiss, based on the release-dismissal agreement. Rumery argued that it was unenforceable because it violated public policy. The district court rejected this argument, and dismissed the suit. The First Circuit reversed, adopting a *per se* rule against release-dismissal

---

Lynch. In either event, the standard of review is the same. *See Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986) (summary judgment reviewed *de novo* ).

agreements. The Supreme Court granted certiorari, and reversed.

The release agreement was upheld by a five-to-four majority. Justice Powell wrote the plurality decision, joined by three other Justices, holding that Rumery had failed to establish a sufficient basis to justify refusal to enforce the agreement. Justice O'Connor, agreeing with the plurality's result, wrote separately to emphasize that the burden of establishing the enforceability of such agreements is borne by the civil rights defendants.

### A. The *Rumery* Rationale—The Plurality's Analysis

The plurality began its analysis by noting that the enforceability of Rumery's waiver was a question of federal law. Applying the "well-established" principle that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement," the plurality held that the mere possibility of harm to the public interest did not justify a *per se* rule against release-dismissal agreements. 480 U.S. at 392, 107 S.Ct. at 1192.

The plurality first examined and rejected Rumery's contention that release-dismissal agreements are inherently coercive, and thus violative of the public policy against involuntary waiver of the right to vindicate constitutional rights through section 1983. It noted that some such agreements may not be the product of an informed and voluntary decision, but that in some cases the criminal defendant's choice to enter into such an agreement "will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." 480 U.S. at 394, 107 S.Ct. at 1193. In such cases, the public interest opposing involuntary waiver is not implicated.

The plurality held that Rumery's decision to enter into the agreement was a voluntary one. Four factors supported this holding: (1) Rumery was a sophisticated businessman; (2) he was not in custody when he agreed to the release; (3) he was represented by an experienced criminal defense attorney, who drafted the agreement; and (4) he considered the agreement for three days before signing it. *Id.* at 394, 107 S.Ct. at 1193. Thus, Rumery's decision to sign the agreement was viewed as a rational and voluntary one.

The plurality then considered whether there was some "external public interest necessarily injured by release-dismissal agreements." *Id.* The plurality acknowledged that the availability of release-dismissal agreements may threaten important public interests in vindication of constitutional rights and fair administration of criminal justice by tempting "prosecutors to bring frivolous charges, or to dismiss meritorious charges, to protect the interests of other officials." *Id.* at 395, 107 S.Ct. at 1193. However, the plurality rejected Rumery's claim that these risks justified a rule of *per se* invalidity. Two lines of argument were critical to this conclusion. First, the plurality argued that *per se* invalidity could be detrimental to other public interests, particularly the interest in relieving officials from the burden of defending marginal or unmeritorious section 1983 claims. Second, the plurality concluded that a *per se* rule overestimates the risks of release-dismissal agreements by "improperly assum[ing] prosecutorial misconduct." *Id.*[4]

Examining the release-dismissal agreement in that case, the plurality held that its enforcement would not violate public policy:

> [I]n this case the prosecutor had an independent, legitimate reason to make this agreement directly related to his prosecutorial responsibilities. The agreement foreclosed both the civil and criminal tri-

---

**4.** As the plurality noted, "the mere opportunity to act improperly does not compel an assumption that all—or even a significant number of—release-dismissal agreements stem from prosecutors abandoning 'the independence of judg-

ment required by [their] public trust.' Rather, tradition and experience justify our belief that the great majority of prosecutors will be faithful to their duty." 480 U.S. at 397, 107 S.Ct. at 1194 (citations omitted).

als concerning Rumery, in which Deary would have been a key witness. She therefore was spared the public scrutiny and embarrassment she would have endured if she had to testify in either of those cases. Both the prosecutor and the defense attorney testified in the District Court that this was a significant consideration in the prosecutor's decision.

480 U.S. at 398, 107 S.Ct. at 1195.

### B. Justice O'Connor's Analysis

The analysis of Justice O'Connor was substantially similar to that employed by the plurality.[5] According to her opinion, "[t]he defendants in a § 1983 suit may establish that a particular release executed in exchange for the dismissal of criminal charges was voluntarily made, not the product of prosecutorial overreaching, and in the public interest.[6] *Id.* at 401, 107 S.Ct. at 1196. She apparently viewed five factors as relevant to this inquiry: (1) the knowledge and experience of the criminal defendant; (2) the circumstances of the execution of the release, including whether the defendant had the benefit of counsel; (3) the nature of the criminal charges pending; (4) the existence of a legitimate criminal justice objective for obtaining the release; and (5) whether the agreement was executed under judicial supervision. *Id.* at 401–02, 107 S.Ct. at 1196–97.

Applying the five factors to Rumery's case, Justice O'Connor agreed with the plurality that enforcement of the agreement was permissible. She had little difficulty

finding that the agreement was entered into voluntarily. *Id.* at 402, 107 S.Ct. at 1197. Thus, the first prong of the test was met. With respect to the public interest prong, Justice O'Connor agreed with the plurality that "the prosecutor had a legitimate reason to enter into this agreement directly related to his criminal justice function." *Id.* Specifically, Justice O'Connor noted that

> Mary Deary's emotional distress, her unwillingness to testify against Rumery, presumably in later civil as well as criminal proceedings, and the necessity of her testimony in the pending sexual assault case against David Champy all support the prosecutor's judgment that the charges against Rumery should be dropped if further injury to Deary, and therefore the Champy case, could thereby be avoided.

480 U.S. at 403, 107 S.Ct. at 1197.

### C. Application of *Rumery* to the Case Before Us

■ As the foregoing analysis indicates, it is apparent from the key opinions in *Rumery* that the release-dismissal agreement signed by Lynch is enforceable only if (1) it was entered into voluntarily; and (2) its enforcement is in the public interest. Both elements are required. We examine each element in turn.

#### 1. Voluntariness

■ The district court found that Lynch voluntarily entered into the release-dismis-

---

5. She wrote separately, however, "to emphasize that it is the burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process." 480 U.S. at 399, 107 S.Ct. at 1195 (O'Connor, J., concurring).

Justice Stevens, writing for the four dissenters, also stated that the section 1983 defendants bear the burden of establishing legitimate law enforcement objectives justifying the release-dismissal agreement. *Id.* at 417, 107 S.Ct. at 1205 (Stevens, J., dissenting). We note, therefore, that a majority of the Supreme Court in *Rumery* expressed the view that the burden of establishing that a release-dismissal agreement does not violate public policy rests with the civil rights defendant seeking to invoke the agreement as a defense.

6. Although Justice O'Connor's test appears to include lack of "prosecutorial overreaching" as a third prerequisite to the validity of a release agreement, her discussion of the threats posed to the public interest (which focuses on the possibility of filing of unmeritorious criminal charges, or the dismissal of meritorious criminal charges) suggests that the presence of prosecutorial overreaching could be viewed as merely a specific example of a violation of the public interest. Thus, the opinions of Justice Powell and Justice O'Connor are in agreement as to the basic test for validity of release agreements— they are valid only if entered into voluntarily and if they serve the public interest.

sal agreement. For good reason Lynch does not challenge this finding. He was a veteran peace officer, having served as a Los Angeles County Marshal for years. He thus was familiar with the criminal process. He was represented by an attorney, and his attorney drafted the agreement. He was not in custody while considering the release, and kept the agreement for four weeks before signing and returning it. *See Rumery*, 480 U.S. at 394, 107 S.Ct. at 1193.

### 2. The Public Interest

The district court did not decide whether the release-dismissal agreement in this case violates public policy. Rather, it interpreted *Rumery* to require an allegation of prosecutorial misconduct, and dismissed Lynch's complaint for failure to make such an allegation. Lynch raises two objections to the disposition below. First, he argues that we should limit *Rumery* to its facts, and adopt a rule barring the use of release-dismissal agreements where the crime with which the defendant is charged is one involving a police officer, and no third parties. Second, he argues that the district court erred in failing to consider his allegations of police misconduct as raising a public policy challenge to the enforceability of the agreement.

■ Lynch's first argument is that the section 148 charge is an example of a category of crimes ("crimes against police" or "police crimes") for which the risk of abuse of the criminal process is particularly great because (1) there are often no independent witnesses of the events forming the basis for the charge; and (2) the objectivity of the police officer in such situations is open to question. Lynch contends that the risk of abuse in this category of crimes is sufficient to justify a rule that release-dismissal

agreements in such situations are always against the public interest.

There is some merit to Lynch's approach. As the *Rumery* Court recognized, the availability of release-dismissal agreements creates a risk that public officials will use the threat of criminal prosecution to suppress civil rights claims. 480 U.S. at 394, 107 S.Ct. at 1193. The limited empirical evidence available suggests that this may be the case. *See* Kreimer, *Releases, Redress, and Police Misconduct: Reflections on Agreements to Waive Civil Rights Actions in Exchange for Dismissal of Criminal Charges*, 136 U.Pa.L.Rev. 851, 869–71 (1988). As Lynch notes, situations in which an officer may have used excessive force in effecting an arrest are particularly troublesome.[7] The arresting officer, facing potential civil liability, has every incentive to arrest on a marginal or nonexistent violation, and push for a charge and release. A risk-averse civil rights plaintiff will have little choice but to give up his civil claim if the officials demand a release of civil liability.

Nevertheless, we must reject the categorical approach urged by Lynch because such an approach is inconsistent with the policies outlined by the Supreme Court in *Rumery*. The *per se* rule offered by Lynch is clearly inconsistent with the *Rumery* Court's emphasis on a case-by-case analysis of the propriety of release agreements. In addition, such an approach would undercut some of the interests furthered by the use of release-dismissal agreements. There will undoubtedly be some cases involving alleged police crimes in which the initial decision to prosecute and the later decision to dismiss in exchange for a release are based on "legitimate" objectives. In fact, it can be argued that release-dismissal agreements may serve everyone's interest particularly well in this type of case.[8] Because each case

---

7. *See e.g., Boyd v. Adams*, 513 F.2d 83, 88–89 (7th Cir.1975) ("[T]hese [release-dismissal] agreements suppress complaints against police misconduct which should be thoroughly aired in a free society. And they tempt the prosecutor to trump up charges for use in bargaining for suppression of the complaint. *The danger of concocted charges is particularly great because*

*complaints against the police generally arise in connection with arrests for extremely vague offenses such as disorderly conduct or resisting arrest.*") (emphasis added).

8. One rationale for the use of these agreements is that they achieve a rough substantial justice where the "true" facts of the case are not

involves unique facts and policy considerations, we hold that *Rumery* requires the district court to hear the evidence and evaluate whether the public interest is served by enforcement of the release-dismissal agreement.

## D. The Public Interest and Prosecutorial Misconduct

The district court's dismissal of the complaint was premised upon Lynch's failure to allege prosecutorial misconduct. The court held:

> In order to succeed on a motion for summary judgment, a defendant must also demonstrate the legitimacy and independence of the prosecutor's reason for making this agreement. However, in this case, plaintiff has failed to allege in his complaint that the prosecutor was in any way guided by improper considerations.... Since plaintiff has failed to allege or otherwise identify the propriety of prosecutorial misconduct as an issue to be decided by the trier of fact, this Court is forced to conclude that no such issue is present in this case.

Memorandum Opinion, ER at 85–86.

■ However, as Lynch points out, the second prong of the *Rumery* test is whether the public interest is served by the agreement, not whether the prosecutor acted with pure motives. The public interest in vindicating constitutional rights and deterring police misconduct is undermined where officials other than the prosecutor fabricate or exaggerate allegations of criminal conduct in order to facilitate the release of civil rights claims through release-dismissal agreements.[9] Thus, affirmative

prosecutorial misconduct is not an essential element of plaintiff's case.

■ Lynch's complaint raises the issue of whether the agreement is in the public interest. Lynch specifically alleged that he did not resist Officer Barrett, or otherwise impede the officers in the performance of their duties. Complaint, ¶ 19, ER at 5. Lynch also alleged that Barrett fabricated the allegations contained in the police report to justify the arrest. *Id.* at ¶ 20. Finally, Lynch alleged that the defendants conspired to force him to sign the agreement upon the threat of prosecution and that the prosecution was not based on legitimate facts. *Id.* at 7, ¶ 30. These allegations are sufficient to raise the public interest issue. It is the burden of the defendants to plead and prove that the agreement serves the public interest. *See Rumery*, 480 U.S. at 399, 401, 107 S.Ct. at 1195, 1196 (O'Connor, J., concurring); *id.* at 417, 107 S.Ct. at 1205 (Stevens, J., dissenting); *Dul v. City of Rome*, No. 86–CV–699, 1987 WL 18733 (N.D.N.Y. Sept. 25, 1987) (LEXIS Genfed Library Dist. File 9692) (burden of pleading and proving validity of the release lies with the defendants).

The district court erred in dismissing Lynch's complaint for failure to allege prosecutorial impropriety. While we express no opinion as to the merits of Lynch's argument that the charges against him were brought merely to extract a release of civil claims, we note that Lynch has presented some evidence suggesting that the circumstances surrounding his arrest and threatened prosecution are somewhat suspicious. An investigative report by Sergeant Henchey dated August 13, 1986

---

known. For example, if the prosecutor is confronted with conflicting stories of police misconduct, and is genuinely unsure as to whom to believe, the execution of a release-dismissal agreement allows everyone to declare the case a draw and go home, thereby avoiding the risk and expense of going to trial. However, in cases where there is not a substantial nexus between the criminal charge and civil rights claim, the prosecutor's uncertainty as to the merits of the criminal charge is a less compelling reason to require dismissal of the civil rights case.

**9.** We acknowledge that the motives and actions of the prosecutor were the focus of the *Rumery* decision. This is not surprising since the prosecutor is the public official most intimately involved in the decision to prosecute and in the decision to require a release agreement in exchange for dropping criminal charges. Nevertheless, the public interest is disserved when a prosecutor negligently fails adequately to investigate and evaluate the allegations of criminal conduct made by arresting officers as well as when a prosecutor intentionally brings trumped-up charges to extort a release of civil claims.

---

states that, based on an oral report from Barrett, he viewed the arrest as questionable. Exhibit G, ER at 43–44 ("I expressed my concern regarding the validity of the 148 P.C. charge to Sergeant Craton after hearing Officer Barrett's verbal report of the incident."). Henchey's report also indicates that after talking to Lynch at the station, another officer, Sergeant Craton, "deemed the arrest charge invalid and discontinued Lynch's detention." *Id.* at 45. Even the Officer's Report filed by Barrett, taken at face value, does not appear to establish a very strong factual basis for criminal charges. In addition, according to Lynch's allegations, his prosecution was not threatened until after it became clear that he was considering a civil claim against the city. We remand to the district court to address whether the enforcement of Lynch's agreement would be in the public interest.[10]

#### E. Attorney's Fees

Both parties request attorney's fees in this case. The defendants' request is without merit, as Lynch's claim is clearly not frivolous. *Dooley v. Reiss,* 736 F.2d 1392, 1396 (9th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). Lynch's request for attorney's fees is premature, as a remand for a merits determination on the public policy issue does not make him a prevailing party for purposes of 42 U.S.C. § 1988. *See Hanrahan v. Hampton,* 446 U.S. 754, 756–57, 100 S.Ct. 1987, 1988–89, 64 L.Ed.2d 670 (1980) (per curiam) (reversal of directed verdict and remand for a new trial insufficient to make appellant a "prevailing party" for purposes of section 1988).

**10.** We recognize that the inquiry that the district court must perform undermines, to some extent, the very purpose of the release-dismissal agreement signed by the parties. Nevertheless, such an inquiry is necessary to conform with the public policy requirement announced by the Supreme Court in *Rumery.* We note that the Court, itself, undertook a detailed analysis of the propriety of the prosecutor's decisions in *Rumery.* Moreover, judicial supervision of release agreements, including, presumably, some

### III.

### CONCLUSION

Lynch does not contest the district court's conclusion that he signed the release-dismissal agreement voluntarily. The court, however, erred in dismissing his action for failure to allege prosecutorial misconduct. We remand to the district court to determine whether enforcement of the agreement signed by Lynch would violate public policy. Each party's request for attorney's fees is denied.

REVERSED and REMANDED.

analysis of the legitimacy of the prosecutor's decisions to bring charges, drop charges, and require a release in exchange, was expressly contemplated by the *Rumery* Court. 480 U.S. at 398, n. 10, 107 S.Ct. at 1195, n. 10; *id.* at 401–02, 107 S.Ct. at 1196–97 (O'Connor, J., concurring). *See also Hammond v. Bales,* 843 F.2d 1320, 1323 (10th Cir.1988) (noting that execution of release-dismissal agreement in that case was under judicial supervision, mitigating against the possibility of prosecutorial abuse).