12 F.3d 1205
 Frances E. LIVINGSTONE and Joseph A. Livingstone, her
husband, Appellants,
v.
NORTH BELLE VERNON BOROUGH, Fayette City Borough, Washington
Township, Frank E. Monack, Jr., individually and in his
capacity as officer of Washington Township, Officer Raymond
Moody, individually and in his capacity as officer for
Fayette City Borough, and Officer Darhl Snyder, individually
and in his capacity as an officer for North Belle Vernon Borough.
 No. 92-3288.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 15, 1992.
Reargued In Banc May 11, 1993.
Decided Dec. 13, 1993.
 
 Peter M. Suwak (argued), Washington, PA, for appellants.
 Thomas P. McGinnis (argued), Grigsby, Gaca & Davies, P.C., Pittsburgh, PA, for appellees Borough of North Belle Vernon and Darhl Snyder.
 Simon B. John, Anne N. John, John & John, Uniontown, PA, for appellees Borough of Fayette City and Raymond Moody.
 Albert C. Gaudio, Monessen, PA, for appellee Washington Tp.
 Timothy M. Maatta, Monessen, PA, for appellee Frank E. Monack, Jr.
 Argued December 15, 1992
 Before: SLOVITER, Chief Judge, GREENBERG, Circuit Judge, and POLLAK,* District Judge.
 Reargued May 11, 1993
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 This is the second time in recent months that the in banc court has considered whether a release-dismissal agreement provides an absolute defense to a plaintiff's civil rights suit alleging police misconduct and excessive use of force. In Cain v. Darby Borough, 7 F.3d 377 (3rd Cir.1993), we held that the release-dismissal agreement relied on by the district court as the basis for its grant of summary judgment to the defendant municipalities and officials was unenforceable because the defendants had not made the requisite case-specific showing that the public interest was served by obtaining the release. In this case, we focus on another prong of the required inquiry into release-dismissal agreements, i.e. the need for defendants to show that there was a knowing and voluntary release-dismissal agreement. Because there are material issues of fact as to whether plaintiffs Frances and Joseph Livingstone validly waived their rights to sue the defendant police officers and municipalities for civil rights violations arising from a domestic dispute at the Livingstone home, we will reverse the district court's order granting summary judgment for the defendants and remand for further proceedings.
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 2
 This civil suit filed by Frances and Joseph Livingstone against the police officers and municipalities arose from the conduct of the police officers on the night of January 12-13, 1989, at the Livingstone home in Washington Township, Pennsylvania. During a family argument between Carrie Livingstone, age twenty-two, who was unmarried and living at her parents' home with her fourteen-month-old son, and Joseph, her father, Mr. Livingstone struck Carrie on the face, causing her lip to split and bleed. Carrie ran out of the house and to the community ambulance service across the street, where an employee called the police. When Officer Frank Monack arrived, Carrie told him that her father had struck her and that her parents were holding her son without her consent.
 
 
 3
 Monack, who was at that time an officer in the Washington Township Police Department and is now Chief of Police, radioed for assistance pursuant to an intermunicipal police cooperation agreement. Raymond Moody, who was and is the Chief of Police for the Borough of Fayette City, and Darhl Snyder, an officer in the North Belle Vernon Police Department, responded. They proceeded to the Livingstone home where Mr. Livingstone permitted them to enter for the purpose, he later testified, of discussing possible criminal charges against him arising out of the incident. Following a brief discussion, Monack and Snyder accompanied Mr. Livingstone outside, and Monack told him to go to the nearby police station to make a statement.[1] No charges were filed against Mr. Livingstone that evening or at any later time.
 
 
 4
 Monack and Snyder then reentered the Livingstone household, this time in search of Carrie's son and admittedly without a warrant or court order.[2] Mrs. Livingstone had retreated to the back bedroom with her grandson, and had locked and barricaded the door. When she refused to open the door, Monack picked the lock and then tried to push the door open. From the partially opened door, Mrs. Livingstone hit him with a fishing rod and scratched him. Monack and Snyder broke the door down to enter the room, and then Monack told Mrs. Livingstone she was under arrest.
 
 
 5
 Mrs. Livingstone testified that both men struck her, causing her to lose consciousness and sustain bruises, lacerations, lost teeth, and head injuries. According to defendants, they used force only for the purpose of getting handcuffs on her after she struck the officer, and a stun gun to subdue her because she was screaming and kicking. Snyder held her down while Monack used the gun. Mrs. Livingstone claims that Monack then said "you want a thrill, I'll give you a thrill" and applied the stun gun between her legs. A medical examination conducted at the hospital that night notes a burn in the vulval area.
 
 
 6
 The officers removed Mrs. Livingstone, handcuffed, from the house. She states that they dragged her outside and dropped her several times, banging her head, and then left her lying in cold muddy water for hours. The officers claim that her thrashing caused them all to fall, and that she refused to get up.
 
 
 7
 On January 13, 1989, the morning after the altercation, Mrs. Livingstone was charged by Monack, on behalf of the Washington Township Police Department, with disorderly conduct, aggravated assault, terroristic threats, resisting arrest, and interference with custody. At a preliminary hearing on April 18, 1989, Mrs. Livingstone was held over for a jury trial on all but the terroristic threats charge, and the aggravated assault charge was reduced to simple assault.
 
 
 8
 The trial in Fayette County Court of Common Pleas began on February 13, 1990, with attorney Thomas R. Ceraso representing Frances Livingstone and Jack R. Heneks, Jr., an Assistant District Attorney, representing the Commonwealth of Pennsylvania. Carrie Livingstone testified for the prosecution, followed by Monack, Snyder, Moody, Police Chief Robert Matthews of Washington Township, and Evelyn Rehe of the community ambulance service. The Commonwealth rested, and Mrs. Livingstone demurred to all of the charges. The demurrer was granted on the charge of interference with custody on the ground that there were no facts showing danger to the child, but was denied as to the other charges.
 
 
 9
 Thereafter, Joseph Livingstone and his son, James, testified for the defense. Before Mrs. Livingstone was to take the stand (and presumably would have testified about her claims with regard to police use of a stun gun on her private parts), the trial judge, Judge Cicchetti of the Court of Common Pleas, met with Heneks and Ceraso to discuss whether the matter could be resolved.[3] After settlement negotiations, a conference was held in camera with Judge Cicchetti. Present were Moody, Monack, Matthews (now deceased), the Livingstones, Ceraso, and Heneks.
 
 
 10
 Ceraso summarized the arrangement by stating that the defense would move for a judgment of acquittal after James Livingstone finished his testimony; that expenses for the physical damage to the Livingstone house and for Mrs. Livingstone's reasonable medical care would be paid; and that once those bills were paid, the Livingstones would release any civil claims. Ceraso stated on the record:
 
 
 11
 there will be an agreement on the part of my client, Mrs. Livingston[e], and also her husband, Joe Livingston[e], who is present, that upon payment of reasonable medical bills that w[e]re associated with the incident that occurred, based on my forwarding those to Washington Township with confirmation, together with bills reflecting damage incurred at the household of Mr. and Mrs. Livingston[e], that Washington Township will cause the same to be paid. At the time of final payment of those bills, there will be a full and complete release signed with reference to any civil action on the part of Mr. and Mrs. Livingston[e]. It's also my understanding that at that time there will also be a release signed by Washington Township, or any of its proper officials, or any member of the police force necessary to release Mr. and Mrs. Livingston[e] from any liability....
 
 
 12
 App. at 1109.
 
 
 13
 In response to the judge's inquiry, the parties voiced an expression of assent. The court asked whether "you all think this is in the best interest for everyone" and Matthews, Monack, and Heneks said they did. App. at 1112. When they returned to the courtroom, Ceraso moved for a judgment of acquittal on the criminal charges against Mrs. Livingstone, which the court granted.
 
 
 14
 It is undisputed that the settlement agreement was never reduced to writing. The Livingstones never submitted for payment any medical bills or household repair bills, and no payments have been made. The Board of Supervisors of Washington Township took no action to officially ratify the agreement until almost two years after the conference in chambers, and only then after this suit was started.[4] There is no evidence that the other two municipal defendants, North Belle Vernon Borough and Fayette City Borough, have ever taken any action to ratify any putative settlement.
 
 
 15
 On January 14, 1991, almost a year after the criminal trial, the Livingstones filed this action against the police officers and the three employer municipalities. The complaint consisted of seven claims: a federal claim filed pursuant to 42 U.S.C. Sec. 1983 (1988), and state law claims alleging assault and battery, malicious prosecution, malicious abuse of process, invasion of privacy, intentional infliction of emotional distress, and conversion.
 
 
 16
 The defendants filed motions to dismiss or, in the alternative, for summary judgment. The district court referred the case to a magistrate judge, who ordered the parties to engage in discovery[5] and to submit briefs and materials in support of the motions.
 
 
 17
 In their briefs in support of summary judgment, defendants argued that the suit was barred by the release-dismissal agreement reached during the in camera conference before Judge Cicchetti. The Livingstones claimed that they never intended to waive their rights to sue, pointing out that the agreement was never reduced to writing and that Washington Township never made the contemplated payments. They also contended that the agreement was never properly entered into by the municipalities, as the Washington Township Board of Supervisors never formally approved it and the other boroughs' governing bodies never considered it, and that the agreement was invalid and unenforceable under Pennsylvania law.
 
 
 18
 On April 8, 1992, the magistrate judge submitted a Report and Recommendation recommending that summary judgment be granted for the defendants on the basis of the release-dismissal agreement. Although the court acknowledged that Washington Township may not have formally approved the agreement, it noted that two supervisors, a quorum, had approved it, thereby satisfying Pennsylvania law. Without comment on the absence of the other municipalities and officers from the agreement, the magistrate judge concluded that plaintiffs had contracted with all of the defendants, and thus the plaintiffs' civil suit was barred; that the agreement comported with due process because the plaintiffs understood that they were waiving their rights to assert future civil claims and had entered into the release voluntarily; and that there was sufficient consideration because the plaintiffs, in exchange for the surrender of their potential civil claims, had secured the dismissal of the criminal charges and a promise by the defendants not to sue them.
 
 
 19
 Objections were filed but the district court adopted the magistrate judge's opinion as its own and granted summary judgment for all defendants. This timely appeal followed.
 
 
 20
 We have jurisdiction under 28 U.S.C. Sec. 1291 (1988). For a grant of summary judgment our review is plenary, and we review the record giving the benefit of all inferences to the non-moving party. See Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988).
 
 II.
 DISCUSSION
 A.
 Applicable Law
 
 21
 The district court granted summary judgment for the defendants in reliance on the Supreme Court's decision in Town of Newton v. Rumery, 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987), where the Court gave effect to a release-dismissal agreement. The plaintiff, Rumery, had been charged with the state-law felony of tampering with a witness, and agreed to release his potential civil rights claims against the town officials in return for the prosecutor's agreement to dismiss all criminal charges. When Rumery nonetheless sued the town officials ten months after the criminal charges were dropped, the defendants moved to dismiss on the ground that the suit was barred by the release-dismissal agreement. The district court dismissed the case, finding that Rumery's waiver was "voluntary, deliberate and informed." Id. at 391, 107 S.Ct. at 1191. The Court of Appeals for the First Circuit reversed, holding that release-dismissal agreements are per se invalid as against public policy because they tempt prosecutors to "trump up charges" in reaction to possible civil rights suits and to suppress evidence of police misconduct, and would leave constitutional violations unremedied. See Rumery v. Town of Newton, 778 F.2d 66, 69 (1st Cir.1985), rev'd, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987).
 
 
 22
 In a 5-4 decision, the Supreme Court reversed, holding that such agreements are not per se invalid. See Rumery, 480 U.S. at 392, 107 S.Ct. at 1191. The Court, looking to federal common law for the policies underlying the waiver of rights conferred by a federal statute,[6] adopted a case-by-case approach to determining whether a release-dismissal agreement should be enforced, balancing the interests in its enforcement against the public interests harmed. See id. Justice Powell wrote for the majority that although some defendants may feel coerced into giving up meritorious claims, the possibility of coercion by itself does not justify an outright ban on such agreements. See id. at 393-94, 107 S.Ct. at 1192-93. After satisfying itself that Rumery voluntarily waived his right to sue, that there was no evidence of prosecutorial misconduct, and that enforcement of the agreement would not adversely affect the public interest, the Court upheld the dismissal of Rumery's section 1983 complaint on the basis of the release. See id. at 398, 107 S.Ct. at 1195.
 
 
 23
 Justice O'Connor concurred in part and in the judgment, emphasizing that because of the great potential for prosecutorial misconduct and coercion, it is the burden of the public officials to "prove " that "a particular release executed in exchange for the dismissal of criminal charges was voluntarily made, not the product of prosecutorial overreaching, and in the public interest." Id. at 401, 107 S.Ct. at 1196 (O'Connor, J., concurring in part and concurring in the judgment). She noted that in assessing voluntariness, courts should consider the knowledge and experience of the defendant, the severity of the criminal charges, whether a "legitimate criminal justice objective" supports the release, whether the defendant was represented by counsel, and whether the execution of the release was judicially supervised. Id. at 401-02, 107 S.Ct. at 1196-97.
 
 
 24
 Justice Stevens dissented, joined by Justices Brennan, Marshall, and Blackmun. He wrote that the waiver could never be deliberate and rational, that society is harmed because the agreements create conflicts of interest for prosecutors, and that the balance is unfair because presumptively innocent defendants give up valuable civil remedies and the goals of section 1983 are thwarted. See id. at 403-20, 107 S.Ct. at 1197-1206 (Stevens, J., dissenting).
 
 
 25
 When this court considered the release-dismissal agreement in Cain in light of the decision in Rumery, the record showed that the Delaware County District Attorney's Office had a blanket policy of requiring a release from every criminal defendant who sought to be placed in the Accelerated Rehabilitative Disposition program. See Cain, 7 F.3d at 379. We held that such a blanket policy did not satisfy the public interest requirement which the majority in Rumery held was a condition of an enforceable release-dismissal agreement. See id. at 381. In light of that holding, we did not address the showing that would be necessary to satisfy Rumery's requirement of voluntariness, an issue to which we now turn.
 
 B.
 Voluntariness
 
 26
 The inquiry into the voluntariness vel non with which a potential civil rights plaintiff waived her right to sue entails more than ascertaining whether there was any coercion. See, e.g., Woods v. Rhodes, 994 F.2d 494, 499 (8th Cir.1993) (identifying as factors relevant to the "voluntariness" inquiry "whether the signer [of the release] is in custody at the time of signing"; "whether the signer was represented by counsel"; "the time with which the signer considered the document"; "whether the signer's attorney drafted the document"; "whether the signer expressed any unwillingness"; and "whether the release is clear on its face"); see also Berry v. Peterson, 887 F.2d 635, 640 (5th Cir.1989). We have used similar factors in determining the voluntariness of waiver in other contexts. See Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir.1988) (ADEA claim). As we have previously noted, the factors relevant to make the determination of voluntariness vary in each case and depend "upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the waiving party." Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1095 (3d Cir.1988) (quotations omitted).
 
 
 27
 The district court in this case correctly recognized that in order for the release-dismissal agreement to have met the standard of voluntariness established by the Rumery court, the Livingstones' assent must have been "voluntary, deliberate and informed." App. at 2585; see Rumery, 480 U.S. at 393, 107 S.Ct. at 1192 ("some release-dismissal agreements may not be the product of an informed and voluntary decision"); see also Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974) (waiver of Title VII cause of action must be "voluntary and knowing"). The burden of proof is upon the party relying on the release. See Rumery, 480 U.S. at 399, 107 S.Ct. at 1195 (O'Connor, J., concurring); id. at 417, 107 S.Ct. at 1204 (Stevens, J., dissenting); Coughlen v. Coots, 5 F.3d 970, 973 (6th Cir.1993); Lynch v. City of Alhambra, 880 F.2d 1122, 1128 (9th Cir.1989). The district court concluded that there was no genuine issue of material fact that that standard was met in this case because "the evidence ... demonstrates that the mutual rights and obligations were explained to the parties, that they fully understood those rights and obligations, and that the Livingstones were at all times counseled by a highly skilled well regarded member of the bar." App. at 2585.
 
 
 28
 Unlike the district court, we conclude the record fails to demonstrate that the Livingstones were fully informed of the nature and scope of the agreement being proposed or even that there ever was a meeting of the minds. As described above, the alleged agreement was reached during a meeting in the chambers of the state judge before whom Frances Livingstone was being tried on the criminal charges arising from the incident at her home. Present at the conference were police officers Monack, Monack's superior officer, Moody, the Livingstones, their attorney, and Assistant District Attorney Heneks.
 
 
 29
 In support of their position that an enforceable release-dismissal agreement was reached at that time, defendants produced the deposition testimony of Officer Monack who described the agreement as follows:
 
 
 30
 I believe that we would pay the medical expenses their insurance didn't cover and for the damage to the residence, and we would also agree not to sue her and she would agree not to sue us. There would be no civil litigation.
 
 
 31
 Q: And that the charges would be dismissed?
 
 
 32
 A: Uh-huh.
 
 
 33
 App. at 1339. Similarly, Assistant District Attorney Heneks submitted an affidavit in which he stated:
 
 
 34
 It is my strong belief that all persons including the Livingston[e]s, understood exactly what was happening. It was very clear after approximately an hour of negotiations that we were not going to proceed to a jury verdict and would allow the case to be dismissed. In return, the township was going to pay the medical bills of Mrs. Livingston[e] and damage to the house of the Livingston[e]s. The Livingston[e]s were agreeing not to sue the police officers and the police officers were agreeing not to sue the Livingston[e]s. Both Mrs. Livingston[e] and Mr. Livingston[e] indicated precisely to Judge Cicchetti that this arrangement was satisfactory to them. Both Livingston[e]s were fully in control of their faculties to the best of my knowledge and exhibited no outward signs of acute distress.
 
 
 35
 App. at 1116-17.
 
 
 36
 On the other hand, there is evidence that puts into question the level of the Livingstones' understanding of the implications and effect of the colloquy in chambers. Frances Livingstone was asked in deposition, "After the meeting was over and you were headed back out to the courtroom, what was your understanding about what was supposed to occur?" She responded:A: In the courtroom?
 
 
 37
 Q: Once you got back in there, what was your understanding as to what was to happen?
 
 
 38
 A: What was to happen in the courtroom you mean?
 
 
 39
 Q: Correct.
 
 
 40
 A: The judge would preside. They would dismiss Jamie [Livingstone] from cross-examination, and there would be a conclusion, and the charges were being dropped against me. And I wasn't allowed to testify because I was to take the stand that morning myself after my son.
 
 
 41
 Q: So it was dismissed?
 
 
 42
 A: Cross-examination.
 
 
 43
 App. at 727-28.
 
 
 44
 Her apparent confusion as to the terms of the arrangement was also displayed when she was asked whether the payment of medical bills was the subject of the conference in chambers, and she responded: "No. That had nothing to do with what we were going back in for." App. at 729. When she was questioned further on whether the medical bills were discussed in Judge Cicchetti's chambers, she answered:
 
 
 45
 A: You mean in the colloquy?
 
 
 46
 Q: Yes.
 
 
 47
 A: There was a mention of medical bills.
 
 
 48
 Q: What about them?
 
 
 49
 A: That I had medical bills that had to be paid.
 
 
 50
 Q: By whom?
 
 
 51
 A: I don't know. I mean, who would be responsible for them. I had to pay them. I was responsible--I mean my husband was responsible.
 
 
 52
 Q: Was there any discussion about whether you were to submit the bills to someone for payment?
 
 
 53
 A: The colloquy was very vague. We was to have a conference, I understood, and the judge would come into that room.
 
 
 54
 App. at 729-30.
 
 
 55
 Mrs. Livingstone was asked whether at any time during the meeting in Judge Cicchetti's chambers she heard the word "settlement" used, and she answered, "No." App. at 747. The questioning continued:
 
 
 56
 Q: You never heard that word?
 
 
 57
 A: "Settlement"?
 
 
 58
 Q: Did you ever hear that word "settle"?
 
 
 59
 A: I can't say that I have not or did. Judge [Cicchetti] said--
 
 
 60
 Q: Did Judge [Cicchetti] say anything about settlement?
 
 
 61
 A: Just have these matters settled and we can go home and sleep. Everyone can go home and sleep.
 
 
 62
 Q: What was your understanding of what he meant by that?
 
 
 63
 A: Well, they were dropping the charges.
 
 
 64
 App. at 747-48.
 
 
 65
 Of course, we do not suggest that a party's lack of understanding, even if genuine, of the terms of an agreement years after it was made necessarily undermines such an agreement. Ordinarily, the existence and terms of the agreement can be resolved by reference to a written document. While we do not hold that as a matter of law an oral agreement to waive the right to sue in exchange for the dismissal of criminal charges can never be valid, the absence of a written release-dismissal agreement requires even more scrupulous review by the courts than otherwise. No published opinion of any of the courts of appeals after Rumery has even considered, much less sustained, an oral release-dismissal agreement. Indeed, the Rumery Court never mentioned the possibility of an oral release-dismissal agreement. Justice Stevens, at least, assumed that such agreements were written. See Rumery, 480 U.S. at 417 n. 22, 107 S.Ct. at 1205 n. 22 ("A court may enforce such an agreement only after a careful inquiry into the circumstances under which the plaintiff signed the agreement and into the legitimacy of the prosecutor's objective in entering into [it]." (emphasis added)) (Stevens, J., dissenting).
 
 
 66
 Written agreements maintain several advantages over their oral counterparts. At a minimum, written agreements allow the parties more opportunity for deliberate reflection. See Woods v. Rhodes, 994 F.2d 494, 497 (8th Cir.1993) (signer had opportunity to review written release for two months); Lynch v. City of Alhambra, 880 F.2d 1122, 1124 (9th Cir.1989) (signer reviewed release for four weeks). Written drafts also facilitate an atmosphere in which each party is able to propose modifications to the agreement. See Woods, 994 F.2d at 497 (parties negotiated after draft release presented); Berry v. Peterson, 887 F.2d 635, 638 (5th Cir.1989) (draft release presented by County revised by signer's attorney). A written agreement may also provide evidence of the parties' respective bargaining power. Compare Rumery, 480 U.S. at 394, 107 S.Ct. at 1192 (citing drafting by plaintiff's attorney as evidence of voluntariness), Lynch, 880 F.2d at 1127 (same) and Hammond v. Bales, 843 F.2d 1320, 1322 (10th Cir.1988) (same) with Vallone v. Lee, 7 F.3d 196, 198 (11th Cir.1993) (district attorney's preparation of release agreement and charge to sign it "the way it is, or else" evidence of involuntariness) and Hall v. Ochs, 817 F.2d 920, 922 (1st Cir.1987) (use of preprinted form).
 
 
 67
 In this case, of course, the existence of a transcript of the in chambers colloquy provides a basis to gauge whether the Livingstones had the opportunity to give the deliberate informed consent that is a condition of their valid waiver of their right to sue. The defendants insist that the voluntariness of the Livingstones' agreement to release them from all civil liability was insured by the presence of the trial judge during that colloquy. To be sure, a thorough inquiry by a judge will often establish that the participants are fully aware of the scope of the undertaking to which their assent is sought. See Government of Virgin Islands v. James, 934 F.2d 468, 473 (3d Cir.1991). In fact, the majority noted in Rumery that "it would be helpful to conclude release-dismissal agreements under judicial supervision." 480 U.S. at 398 n. 10, 107 S.Ct. at 1195 n. 10. Unfortunately, in this case notwithstanding the presence of a judge we still find patent ambiguity as to the existence of informed consent.
 
 
 68
 As shown by the transcript of the chambers conference, the judge introduced the issue of release-dismissal by the announcement that "we have been discussing the matter, and the attorneys have come up with a solution to this problem." App. at 1109. Ceraso then summarized his understanding, as set forth above, and he asked whether the parties understood. Monack responded affirmatively, but Mrs. Livingstone showed some lack of understanding of the arrangement, asking: "[e]xcuse me. Would that be Fayette City and all three, you know, that they could come back," apparently questioning whether the Livingstones would be subject to any further threat of criminal prosecution, or possibly civil litigation. It is not clear that Ceraso's answer was directly responsive:
 
 
 69
 Well, in reality, no. The only liability that could be incurred, in my opinion, at this point, would be with regard to Washington Township, its police force, and its officers. However, since there were two other police departments involved in this, I have no objection if those police departments or those municipalities also wish to be included in the release, and we would then have reciprocal releases from them, and we would let that up to their individual counsel to make that decision, but we certainly would have no objection in doing that so it would be reciprocal on both sides.
 
 
 70
 App. at 1110. Ceraso continued,
 
 
 71
 It would be my further understanding, your Honor, if this is acceptable, that the Commonwealth would conclude questioning of the present witness, that the defense would rest at that time, that I on behalf of my client, under the provisions of Rule 1124, would move for a judgment of acquittal. My reasons for movement for judgment of acquittal on the record, your Honor, would be that the case that the Commonwealth has presented has, in fact, included certain defenses which could be asserted, including the defense of self-defense, which has not been disproved by the Commonwealth, and on that basis it would be my motion that as a matter of law the defendant would be entitled to a judgment of acquittal at that point.
 
 
 72
 App. at 1110-11.
 
 
 73
 After Heneks signified his agreement, the judge then explained his view that no one could benefit by going forward with the case. The judge's comments in full were:
 
 
 74
 The only reason I'm conducive to this kind of situation, and I discussed this with the attorneys, is I don't see anything that can benefit by going any further with the case. No matter which way it goes, if there's a guilty or a not guilty verdict, I don't see any way anybody can benefit. This way everyone can leave here and have this matter resolved, and maybe everyone can sleep a little better at night.
 
 
 75
 There's no evidence that they were ever going to harm the child, and the police were trying to do their job. We all run these risks when we have these kinds of positions, and domestic cases are the worst possible cases to be involved in. We all know that, and it's hard to handle those things. You all get involved in these. We all make mistakes.
 
 
 76
 App. at 1111.
 
 
 77
 Judge Cicchetti asked Frances "But is this satisfactory to you Mrs. Livingston[e]?" App. at 1111 (emphasis added). She responded, "Yes, sir." App. at 1111. The judge then asked Joseph Livingstone, Monack, Matthews, and Moody whether they were satisfied, and all replied in the affirmative. Finally, there was an off-the record discussion about "money," which none of the affidavits elucidates.
 
 
 78
 The antecedent of the word "this" in Judge Cicchetti's question to Mrs. Livingstone is hardly manifest. The entire chambers conference took ten minutes.[7] There was no explicit statement that the Livingstones were giving up their right to sue for physical injuries, damage to the household, and the alleged violations of their constitutional rights. Nobody explained to the Livingstones what was encompassed by the "full and complete release" to which Ceraso had referred and, significantly, no such release was presented to the Livingstones at that time or ever.
 
 
 79
 The contrast between the circumstances of this agreement and those before the Supreme Court in Rumery is pronounced. There, Justice Powell pointed out that a defendant's choice to enter into a release agreement may "reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." 480 U.S. at 394, 107 S.Ct. at 1192. In holding that Rumery's circumstances "exemplifie[d]" such a "voluntary decision," Justice Powell pointed to the following: Rumery was a "sophisticated businessman"; "[h]e was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement"; and "Rumery considered the agreement for three days before signing it." Id.
 
 
 80
 Given the different fact scenario with respect to the Livingstones, the lack of a clear on-the-record statement of the rights the Livingstones were being asked to waive, the abbreviated discussion in chambers, and the absence of any proposed written agreement which the Livingstones could read, much less take home to review, we conclude that the defendants have not met their burden to prove that the Livingstones gave informed and voluntary consent to a waiver of their right to bring an action under section 1983.
 
 
 81
 Because the defendants have failed to show that there are no genuine issues of material fact on the issue of the Livingstones' informed and voluntary consent to release their right to sue, we need not decide at this time many of the other issues as to which the parties have differed, such as whether the putative agreement was sufficiently definite to constitute a binding contract, the effect of the Livingstones' failure to forward to Washington Township Mrs. Livingstone's medical bills and the couple's bills for property damage, the failure of Washington Township to promptly ratify the agreement by formal resolution until after this suit was brought, and the validity of any such agreement under Pennsylvania law.[8] The district court did not rule on these matters which, if relevant on remand, are for that court's consideration in the first instance.
 
 
 82
 Should the district court determine that there is a jury issue as to voluntariness,[9] the release cannot be upheld unless it also withstands the court's scrutiny as to whether there was prosecutorial overreaching and whether the release-dismissal agreement advanced the public interest. Although the court in Berry stated these issues are for the court rather than the jury, 887 F.2d at 637, there may be factual issues intertwined with the legal issues, such as whether the public interest reason proffered by the prosecutor is the actual reason that motivated the prosecutor to enter into the release-dismissal agreement. Id. at 637 n. 2.
 
 
 83
 In our recent opinion in Cain, we explained that defendants must show that the prosecutor made the decision to enter into a release-dismissal agreement out of a case-specific concern for the public interest in preserving governmental resources rather than out of concern for the private interests of government officials. 7 F.3d at 381. Examples of valid prosecutorial interests accepted by the courts are the desire to protect a witness from the trauma of testifying discussed in Rumery, 480 U.S. at 398, 107 S.Ct. at 1195, and the move of the principal prosecution's witness away from the area of trial in Woods, 994 F.2d at 500. In applying that consideration here, the district court will have to take into account that the agreement was struck, if at all, towards the conclusion of Mrs. Livingstone's defense, that the cost of the prosecution had already been incurred, and that whatever opportunity existed for further rupture within the Livingstone family had been accomplished by the testimony of all family members save Mrs. Livingstone. We make these comments merely to emphasize for the district court's benefit that a general belief by prosecutors that release-dismissal agreements serve valid purposes is not sufficient to satisfy the public interest prong of the Rumery test.
 
 
 84
 The release is only one of the defenses asserted by the defendants.[10] If it is not dispositive pre-trial, the court will, of course, proceed to the remaining issues.
 
 III.
 CONCLUSION
 
 85
 For the reasons set forth above, we will reverse the entry of summary judgment and remand for further proceedings in accordance with this opinion.
 
 
 
 *
 Hon. Louis H. Pollak, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The parties dispute whether Monack also told Mr. Livingstone he was under arrest
 
 
 [2]
 There is some dispute as to Moody's whereabouts
 
 
 [3]
 Plaintiffs assert that the Commonwealth initiated settlement negotiations, but Heneks in his affidavit states that it was the trial judge who instigated the settlement discussions. We do not find this a material dispute. The effect of the agreement "is not dependent upon which party first suggests the release...." Boyd v. Adams, 513 F.2d 83, 88 (7th Cir.1975)
 
 
 [4]
 There was testimony that on the day of the settlement, two of the three members of Washington Township's Board of Supervisors were in the courthouse, were informed of the agreement, assented to it, and later telephoned the third supervisor, who also agreed. Washington Township has attached to its brief a document showing an official ratification by its Board of Supervisors in February 1992, after this suit was filed
 
 
 [5]
 Ceraso declined to give a deposition on the ground of the attorney-client privilege asserted by Mrs. Livingstone. The magistrate judge, and thereafter the district court, denied defendants' joint motion to compel his testimony. Mrs. Livingstone also refused to answer any questions regarding her conversations with Ceraso about the release-dismissal agreement, and again the magistrate judge denied the motion of defendants to compel her to reveal this information
 Plaintiffs concede that they asserted the privilege for "tactical" reasons, to make it difficult for the defendants to show that Mrs. Livingstone acted on the advice of her counsel and suggest that they may now be willing to waive the attorney-client privilege. Appellants' Brief at 28 n. 2. Inasmuch as the privilege issues are not before us in this appeal, we do not take any position on whether a party who challenges a release may assert the attorney-client privilege to conceal the information which her opponent needs to meet that challenge. See, e.g., Hunt v. Blackburn, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888); United States v. Bilzerian, 926 F.2d 1285, 1291-94 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).
 
 
 [6]
 Whereas Rumery counsels that the validity of a release-dismissal for a section 1983 claim is governed exclusively by federal law, to be determined by reference to such "traditional common-law principles" as the Restatement of Contracts, 480 U.S. at 392 & n. 2, 107 S.Ct. at 1191 & n. 2, the validity of any purported release of the state claims asserted in the Livingstones' complaint is governed by state law. In Pennsylvania, where the courts frequently follow the principles set forth in the Restatement, see, e.g., Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744, 751 (1983); Penneys v. Pennsylvania R.R. Co., 408 Pa. 276, 183 A.2d 544, 546 (1962), "[w]ritten releases are construed according to the rules governing the construction of contracts generally." Sparler v. Fireman's Ins. Co., 360 Pa.Super. 597, 521 A.2d 433, 434 (1987). It follows that the contract principles we apply to determine whether the parties entered into a binding release-dismissal agreement are substantially the same for all of the Livingstones' claims. At least the parties do not suggest otherwise
 
 
 [7]
 The court reporter's notes show that the conference began at 10:20 a.m. and concluded 10:30 a.m. App. at 1108, 1113
 
 
 [8]
 The Livingstones contend that the release-dismissal agreement is ultra vires because it obligates the township to indemnify an individual for an uncertain amount in violation of 53 Pa.Stat.Ann. Sec. 65902 (Purdon 1982 & Supp.1992) (specific appropriation must be budgeted for any contract requiring the expenditure of public funds from township coffers) and that the informal consent of the two Washington Township supervisors at the courthouse contravened the Pennsylvania Sunshine Act. 65 Pa.Stat.Ann. Secs. 271-286 (Purdon Supp.1992). Defendants respond, citing authority, that neither of these statutes is relevant here. As noted in the text, we express no opinion on these issues
 
 
 [9]
 Although we do not preclude the district court from again granting summary judgment on remand should the record be free from material fact issues, we feel obliged to note our view that absent a retraction of the testimony of Mrs. Livingstone on this issue, it is unlikely that the court can determine that plaintiffs made a deliberate, informed and voluntary waiver without submission of that issue to a jury. See Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 147 (3d Cir.1993) ("Summary judgment is inappropriate when a case will turn on credibility determinations and ... on state of mind." (citations omitted))
 
 
 [10]
 The defendants raise several issues going to the viability of the Livingstones' claims. For example, North Belle Vernon and Snyder contend that plaintiffs' claim for invasion of privacy is barred by the one-year statute of limitations; that Mr. Livingstone's claim for loss of consortium is not recognized under section 1983; and that the complaint fails in part to state a claim upon which relief may be granted. Defendants also argue that plaintiffs' punitive damages claim is not recognized under section 1983 and that the conversion claim is barred under Pennsylvania law. We do not consider arguments unrelated to the validity and scope of the release-dismissal agreement because the Magistrate Judge and the district judge reached their conclusions solely on the basis of that agreement